```
 1              IN THE UNITED STATES DISTRICT COURT

 2                   FOR THE DISTRICT OF HAWAII

 3
     UNITED STATES OF AMERICA,    )      CRIMINAL NOS. 21-00061-LEK
 4                                )                    23-00003-LEK
                Plaintiff,        )
 5                                )      Honolulu, Hawaii
           vs.                    )
 6                                )      February 13, 2025
     MARTIN KAO,                  )
 7                                )      SENTENCING AS TO COUNTS 1
                Defendant.        )      THROUGH 8 UNDER CRIMINAL
 8                                )      NUMBER 21-00061 AND COUNT 1
                                  )      UNDER 23-00003 TO THE
 9   _____)      INDICTMENT

10                      TRANSCRIPT OF PROCEEDINGS
                 BEFORE THE HONORABLE LESLIE E. KOBAYASHI,
11               SENIOR UNITED STATES DISTRICT COURT JUDGE

12   APPEARANCES:

13   For the Plaintiff:          CRAIG S. NOLAN, ESQ.
                                 Office of the United States Attorney
14                               PJKK Federal Building
                                 300 Ala Moana Boulevard, Suite 6100
15                               Honolulu, Hawaii  96850

16   For the Defendant:          VICTOR J. BAKKE, ESQ.
                                 Law Office of Victor Bakke
17                               Topa Financial Center
                                 700 Bishop Street, Suite 2100
18                               Honolulu, HI 96813

19                               MELINDA K. YAMAGA, ESQ.
                                 Office of the Federal Public
20                               Defender
                                 PJKK Federal Building
21                               300 Ala Moana Blvd Rm 7-104
                                 Honolulu, HI 96850

22
     Official Court Reporter:    Gloria T. Bediamol, RPR RMR CRR FCRR
23                               United States District Court
                                 300 Ala Moana Boulevard
24                               Honolulu, Hawaii 96850

25   Proceedings recorded by machine shorthand, transcript produced
     with computer-aided transcription (CAT).
```

| | 1 | February 13, 2025 | 1:33 p.m. |
|---|---|---|---|

01:33PM  2          THE CLERK:  Criminal Numbers 21-00061-LEK and

01:33PM  3  23-00003-LEK, United States of America versus Martin Kao.

01:33PM  4          This case has been called for sentencing as to Counts

01:33PM  5  1 through 8 under Criminal Number 21-61 and Count 1 under 23-03

01:33PM  6  to the indictment.

01:33PM  7          Counsel, please make your appearances for the record.

01:33PM  8          MR. NOLAN:  Good afternoon, Your Honor.  Craig Nolan

01:33PM  9  for the government.  Also present is Sara Nieling of the

01:33PM  10  probation office.

01:33PM  11          THE COURT:  Good afternoon to you both.

01:33PM  12          MR. BAKKE:  Good afternoon, Your Honor.  Attorney

01:33PM  13  Victor Bakke on behalf of Mr. Kao.

01:33PM  14          Your Honor, I'm representing him in Criminal Number

01:34PM  15  21-00061, and Mr. Kao is obviously present.

01:34PM  16          THE COURT:  All right.  The record will reflect the

01:34PM  17  presence of Mr. Kao.  How are you today, sir?

01:34PM  18          THE DEFENDANT:  I'm okay.  Thank you for asking.

01:34PM  19          THE COURT:  Thank you.

01:34PM  20          Ms. Yamaga.

01:34PM  21          MS. YAMAGA:  Thank you, Your Honor.  Good afternoon,

01:34PM  22  Melinda Yamaga, I am also representing Mr. Kao; however, I am

01:34PM  23  representing him in Criminal Number 23-00003-LEK.

01:34PM  24          THE COURT:  All right.  Will each of you or only one

01:34PM  25  of you be making argument with regard to sentencing?

| | | |
|---|---|---|
| 01:34PM | 1 | MR. BAKKE:  I will be, Your Honor.  I will be lead on |
| 01:34PM | 2 | this. |
| 01:34PM | 3 | THE COURT:  All right.  Very good.  Do you need some |
| 01:34PM | 4 | time to have the hearing assistance?  I saw you struggling. |
| 01:34PM | 5 | MR. BAKKE:  No, we did it ahead of time. |
| 01:34PM | 6 | THE COURT:  Very good.  Is it working? |
| 01:34PM | 7 | MR. BAKKE:  Yes. |
| 01:34PM | 8 | THE COURT:  Do you need help?  Very good. |
| 01:34PM | 9 | MS. YAMAGA:  I will have one comment specific to my |
| 01:34PM | 10 | case in the criminal forfeiture order that was signed; that's |
| 01:34PM | 11 | it. |
| 01:34PM | 12 | MR. BAKKE:  So we won't be overlapping, Judge. |
| 01:35PM | 13 | THE COURT:  Sounds very good.  Thank you.  So everyone |
| 01:35PM | 14 | but Mr. Kao and Mr. Bakke may be seated. |
| 01:35PM | 15 | All right.  So, Mr. Kao, we are here -- you need to |
| 01:35PM | 16 | stand -- so we're here today for your sentencing hearing.  At |
| 01:35PM | 17 | this hearing, I'm going to make certain factual findings and |
| 01:35PM | 18 | then I'm going to go over what I believe to be the aggravating |
| 01:35PM | 19 | and mitigating factors in your case.  And then I'm going to |
| 01:35PM | 20 | hear from Mr. Nolan on behalf of the government, on the |
| 01:35PM | 21 | government's position on what an appropriate sentence is for |
| 01:35PM | 22 | you. |
| 01:35PM | 23 | An appropriate sentence is one under the law that's |
| 01:35PM | 24 | sufficient but not greater than necessary to meet the goals of |
| 01:35PM | 25 | sentencing.  And the goals of sentencing include just |

01:35PM  1    punishment for the harm that you have done to our community, an

01:35PM  2    opportunity to prevent you and others from committing these

01:35PM  3    types of crimes in our community, and to give you an

01:36PM  4    opportunity for rehabilitation.

01:36PM  5         And then of course I'm going to hear from Mr. Bakke

01:36PM  6    and Ms. Yamaga, and then you'll have an opportunity to speak on

01:36PM  7    your behalf, if you wish.  You don't have to, it won't be held

01:36PM  8    against you if you don't.  And then I'm going to take all of

01:36PM  9    this information, in addition to the very comprehensive

01:36PM  10   presentence investigation report, and I will use that to

01:36PM  11   fashion your sentence.  All right?

01:36PM  12        So let me first ask you to confirm that you and your

01:36PM  13   attorneys have had a full opportunity to reread, review and to

01:36PM  14   file any objections to the contents of the presentence

01:36PM  15   investigation report.  Have you had that opportunity, Mr. Kao?

01:36PM  16            THE DEFENDANT:  Yes, Your Honor.

01:36PM  17            THE COURT:  You would agree with that, Mr. Bakke?

01:36PM  18            MR. BAKKE:  Yes, Your Honor.

01:36PM  19            THE COURT:  Ms. Yamaga.

01:36PM  20            MS. YAMAGA:  Yes, Your Honor.

01:36PM  21            THE COURT:  All right.  You may all be seated.

01:36PM  22            The Court makes the following factual findings that on

01:36PM  23   September 7, 2022, Mr. Kao, you pled guilty to the eight-count

01:37PM  24   indictment charging you in Criminal Number number 21-61, Counts

01:37PM  25   1, 2, 3, which charged you with Wire Fraud Scheme in Relation

01:37PM   1   to a Presidentially Declared Emergency in violation of federal

01:37PM   2   law; Counts 4 through 8, Money Laundering, in violation of

01:37PM   3   federal law; and in Criminal Number 23-03, to Count 1, Bank

01:37PM   4   Fraud.

01:37PM   5          I now place the presentence investigation report in

01:37PM   6   the record under seal.  If an appeal is taken, counsel will

01:37PM   7   have access to all of the report including the confidential

01:37PM   8   recommendation.

01:37PM   9          I have received several letters in support that were

01:37PM   10   attached to your sentencing memorandum in 23-0003-LEK and I've

01:37PM   11   gone through all of them.

01:37PM   12          Mr. Nolan, it's my understanding the government has no

01:37PM   13   remaining objections to either the factual findings or the

01:38PM   14   application of the guidelines to the facts; is this correct?

01:38PM   15          MR. NOLAN:  That is correct, Your Honor.

01:38PM   16          THE COURT:  Mr. Bakke and Ms. Yamaga, are there any

01:38PM   17   remaining objections that the Court needs to address?

01:38PM   18          MR. BAKKE:  None from me, Your Honor.

01:38PM   19          MS. YAMAGA:  No, Your Honor.  Thank you.

01:38PM   20          THE COURT:  Then the Court adopts the factual findings

01:38PM   21   in the presentence report including the addendum that addressed

01:38PM   22   all of the objections.  I agree with probation.

01:38PM   23          There has been a request for the Court to consider

01:38PM   24   specific 3553(a) factors of Mr. Kao, and that's set forth in

01:38PM   25   the sentencing memorandum, in which I have read.  So based on

01:38PM   1    all of this information, the Court determines that the

01:38PM   2    applicable guidelines are:  Total offense level 29, criminal

01:38PM   3    history category 1.  This gives a guideline range of 87 to

01:38PM   4    108 months, as to Counts 1 through 3, under Criminal Number

01:39PM   5    21-61; and Count 1, under Criminal Number 23-03; and as to

01:39PM   6    Counts 4 through 8, under Criminal Number 21-61.

01:39PM   7             Supervised release, the guideline range is two to five

01:39PM   8    years, as to Counts 1 through 3, under Criminal Number 21-61;

01:39PM   9    Count 1, under Criminal Number 23-03, the statutory maximum is

01:39PM   10   up to five years; as to Counts 4 through 8, under Criminal

01:39PM   11   Number 21-61, the statutory maximum is up to three years.

01:39PM   12            Fine plus cost of imprisonment and supervised release,

01:39PM   13   the guideline range is $30,000 to $1 million.  The statutory

01:39PM   14   provisions are for Counts 1 through 3, under Criminal Number

01:39PM   15   21-61, and Count 1, under Criminal Number 23-03, is up to

01:40PM   16   $1 million.  As to Counts 4 through 8, under Criminal Number

01:40PM   17   21-61, the statutory provision is up to $250,000 or twice the

01:40PM   18   amount of the criminally derived property involved.

01:40PM   19            Restitution is in the amount of $12,841,490.  And

01:40PM   20   there's a mandatory special assessment of $100 per count for a

01:40PM   21   total of $900.

01:40PM   22            So these are the factors the Court sees in aggravation

01:40PM   23   and mitigation, Mr. Kao.

01:40PM   24            In aggravation, I first turn to the nature and

01:40PM   25   circumstances of the offenses to which you pled guilty.  In

| | | |
|---|---|---|
| 01:40PM | 1 | your situation you, through your company Navatek, applied for |
| 01:40PM | 2 | three Paycheck Protection Program loans during the COVID-19 |
| 01:41PM | 3 | pandemic.  These loan requests totaled $15,694,329.  You |
| 01:41PM | 4 | committed fraud because the applications contained false |
| 01:41PM | 5 | information about your company's payroll and the number of |
| 01:41PM | 6 | employees which were all falsified.  You also falsely stated |
| 01:41PM | 7 | that Navatek would not receive any other PPP loans. |
| 01:41PM | 8 | To compound this falsity, you used influence and |
| 01:41PM | 9 | pressure on senior bank officials to process the loan quickly |
| 01:41PM | 10 | by stating you had a relationship with our senators and |
| 01:41PM | 11 | congresswoman in congress, and that they supported a quick |
| 01:41PM | 12 | approval.  As a result of these false applications, you |
| 01:41PM | 13 | received $12,841,491 for two loans, the third loan was denied, |
| 01:42PM | 14 | and you directed others to move those loan proceeds to |
| 01:42PM | 15 | different accounts, including $2 million to your personal |
| 01:42PM | 16 | account.  You enriched yourself at the expense of local |
| 01:42PM | 17 | businesses that were struggling and suffering and needed |
| 01:42PM | 18 | emergency funds.  And ultimately, as a result of your actions, |
| 01:42PM | 19 | it's the taxpayers of this country, of our community, who have |
| 01:42PM | 20 | been defrauded and left holding literally the bag to pay for |
| 01:42PM | 21 | all of these millions. |
| 01:42PM | 22 | Other factors are characteristics.  You have a prior |
| 01:42PM | 23 | conviction for assault, so you have a history of violence.  You |
| 01:42PM | 24 | pled guilty and are awaiting sentencing in the District of |
| 01:42PM | 25 | Columbia for conspiring to make unlawful federal campaign |

01:43PM  1    contributions and then submitting false documents to hide these

01:43PM  2    contributions.  This demonstrates to the Court that you have

01:43PM  3    lived a life of a pattern of deceit and embezzlement and

01:43PM  4    entitlement and with a disregard for the law.

01:43PM  5          Another victim in your case is the Bank of Hawaii.

01:43PM  6    You altered multiple documents, when applying for a residence

01:43PM  7    on Kahala Avenue, and received a $3 million mortgage loan for

01:43PM  8    which you were not eligible.  As a result of your falsity, the

01:43PM  9    bank was forced to spend legal fees to foreclose, which will

01:43PM  10    continue incurring costs until the loan is paid off.

01:43PM  11          I've looked at your financial information in the

01:43PM  12    presentence report.  There are several properties that you are

01:43PM  13    on deed for, two in Kahala one in Beverly Hills; there's

01:44PM  14    investment properties; there are cars, including a Mercedes and

01:44PM  15    Ferrari.  So the question becomes why.  And I can only conclude

01:44PM  16    it was simply and blatantly greed.

01:44PM  17          There are factors in mitigation.  You have education

01:44PM  18    and training to support yourself in a legally and acceptable

01:44PM  19    way; you have no history of mental illness; you have no history

01:44PM  20    of drug addiction, although to your credit you self-reported an

01:44PM  21    alcohol addiction while on bond; you have the support of your

01:44PM  22    wife; you have two young children, ages eight and 9, one of

01:44PM  23    whom has disabilities and needs assistance in that for autism

01:44PM  24    and hearing impairment; and you have done volunteer work while

01:44PM  25    on bond with your church, Meals on Wheels.  So those are the

| | | |
|---|---|---|
| 01:44PM | 1 | factors in mitigation. |
| 01:45PM | 2 | So I'll turn now to Mr. Nolan with regard to the |
| 01:45PM | 3 | government's position on an appropriate sentence. |
| 01:45PM | 4 | Mr. Nolan. |
| 01:45PM | 5 | MR. NOLAN:  Sure.  Thank you, Your Honor.  Before I |
| 01:45PM | 6 | get to our position, I just want to put on the record that |
| 01:45PM | 7 | PacMar, through its -- I may get his title wrong -- |
| 01:45PM | 8 | president/owner, Steven Loui, is present.  The probation office |
| 01:45PM | 9 | found to be PacMar victim, couldn't sort out the legal bills |
| 01:45PM | 10 | well enough to come up with a definitive restitution figure. |
| 01:45PM | 11 | Mr. Loui, through his attorney, Jesse Schiel, who is also |
| 01:45PM | 12 | present, has asked to address the Court.  So is the Court -- |
| 01:45PM | 13 | THE COURT:  Yes, absolutely.  Victims have a right to, |
| 01:45PM | 14 | and if there is anyone from Bank of Hawaii, I would encourage |
| 01:45PM | 15 | them to come forward as well. |
| 01:45PM | 16 | MR. NOLAN:  We don't have representatives of the |
| 01:45PM | 17 | victim banks here or the Small Business Administration.  Would |
| 01:46PM | 18 | you like Mr. Loui to come forward now? |
| 01:46PM | 19 | THE COURT:  Yes, please, to the podium if he's |
| 01:46PM | 20 | comfortable.  If not, then next to you at counsel table. |
| 01:46PM | 21 | Whatever you are comfortable with.  Aloha.  Welcome. |
| 01:46PM | 22 | MR. LOUI:  Your Honor, thank you for allowing me the |
| 01:46PM | 23 | opportunity to speak today.  I am Steven Loui, owner of PacMar |
| 01:46PM | 24 | Technologies, formally known as Navatek.  I'm here to redeem |
| 01:46PM | 25 | myself from transferring the company I love and started to the |

01:46PM  1    con man and criminal Martin Kao, who has damaged the company I

01:46PM  2    founded and its loyal and outstanding employees.

01:46PM  3         Pacific Marine & Supply Company is a ship-repair

01:46PM  4    company founded in 1944 by my father, Fred Loui.  After my

01:46PM  5    father unexpectedly passed away in 1969, I returned home after

01:46PM  6    college, after graduating in engineering, to take over the

01:47PM  7    operations of the company.  Under my leadership, Pacific Marine

01:47PM  8    became the largest commercial ship repair and dry-docking

01:47PM  9    company in Hawaii.

01:47PM  10        To complement Pacific Marine's operations, I started

01:47PM  11   PacMar Technologies in the 1970s under its original name

01:47PM  12   "Navatek Limited."  Since its formation, PacMar's focus was on

01:47PM  13   developing advanced ships and marine technologies to improve

01:47PM  14   passenger ride quality, reduce operator injury, and improve

01:47PM  15   hull efficiency.  PacMar has since grown into a diversified

01:47PM  16   technology company with an international presence, leading the

01:47PM  17   way in research engineering, design, innovation and

01:47PM  18   hydrodynamics.

01:47PM  19        Mr. Kao joined Pacific Marine in 2008, several decades

01:47PM  20   after the company had been formed, and I would like to say

01:47PM  21   successful.  We are well known for our SWATH ships, dinner

01:47PM  22   boats and research ships that we had built.  Unbeknownst to me

01:48PM  23   until very recently, Mr. Kao's deceit began at hiring, where he

01:48PM  24   falsely represented orally, and in his resume, that he held law

01:48PM  25   degrees from UCLA and NYU.  It was only through his initial

01:48PM    1    deceit that I offered Mr. Kao a job.

01:48PM    2            In or around August 2018, after 40 years of running

01:48PM    3    the company, I decided to step away from the day-to-day

01:48PM    4    operations and believed I had found a worthy successor in

01:48PM    5    Mr. Kao to keep the company prospering and he would be one who

01:48PM    6    took good care of the employees.

01:48PM    7            Unfortunately, Mr. Kao did the opposite, running the

01:48PM    8    company immediately into the ground just one year through

01:48PM    9    numerous acts of criminality.  Mr. Kao's, criminality included

01:48PM   10    not only the PPP fraud but also campaign finance fraud and

01:49PM   11    mortgage fraud, all of which the Court is well aware of.

01:49PM   12            Upon learning of Mr. Kao's outsized PPP loans through

01:49PM   13    an article in the Star Advertiser in the summer of 2020, I

01:49PM   14    immediately reported Kao's fraud to law enforcement and

01:49PM   15    participated in law enforcement investigations to ensure that

01:49PM   16    Mr. Kao was held responsible for his actions and to make sure

01:49PM   17    that the company's reputation and name remained clear.

01:49PM   18    Thereafter, I immediately initiated state proceedings to have

01:49PM   19    Mr. Kao removed from the company and began the lengthy process

01:49PM   20    of saving the company.

01:49PM   21            In this short period, Kao virtually destroyed a very

01:49PM   22    productive and local company, one which had a great reputation

01:49PM   23    at all times prior to Mr. Kao joining it.  Approximately 91

01:49PM   24    employees, roughly half the company's work force, resigned

01:50PM   25    within nine months of Kao's arrest.  Kao's criminality

01:50PM 1  paralyzed the company's ability to secure vital government
01:50PM 2  contracts that are the life blood of its business.  Our
01:50PM 3  security holdings for our top secret research were put on hold
01:50PM 4  for many months until we were able to clear it.  In that time
01:50PM 5  we lost many jobs.  The company has managed to survive but only
01:50PM 6  through the loyal and incredibly dedicated work of its
01:50PM 7  remaining employees, some of which are here today.  I also
01:50PM 8  provided large financial support to meet the cash needs of the
01:50PM 9  company.
01:50PM 10        While Mr. Kao cannot defend his past, he now seeks the
01:50PM 11 mercy of the Court at sentencing conveniently asserting that he
01:50PM 12 has been reborn and found new meaning in life.  Put simply,
01:50PM 13 Martin's story, and all he has said about his request for a
01:51PM 14 reduction in sentencing because of his asserted rehabilitation
01:51PM 15 I believe is a fallacy.
01:51PM 16        Contrary to self-serving statements to this Court,
01:51PM 17 Mr. Kao has shown absolutely no remorse for the harm he has
01:51PM 18 caused to me, to the company, and the senior employees he fired
01:51PM 19 to clear a way for his criminal cohorts.  And certainly not to
01:51PM 20 any of the employees, including many of the hard-working loyal
01:51PM 21 employees who lost their jobs due to the wreckage he left
01:51PM 22 behind.  These -- the employees who stayed are the ones really
01:51PM 23 responsible for saving the company.
01:51PM 24        Mr. Kao has also shown no remorse by refusing to pay
01:51PM 25 the company back the millions he stole from it.  Instead of

01:51PM  1  repaying the company, Mr. Kao has hidden his millions in assets

01:51PM  2  through a series of fraudulent conveyances and other

01:51PM  3  misconduct.  We have multiple lawsuits to recover those funds.

01:52PM  4  Mr. Kao has defied all attempts and has not paid any of the

01:52PM  5  millions in damages that have been awarded against him, much of

01:52PM  6  which was simply stolen from the company.  For example, he --

01:52PM  7  contrary to the company's operating charter, he had the company

01:52PM  8  issue checks to pay for his defense attorney shortly after his

01:52PM  9  arrest.  Any amounts the company has received to date are due

01:52PM  10  to our costly legal actions to garnish wage and rental income.

01:52PM  11  The total Circuit Court awarded damages and accrued interest he

01:52PM  12  owes the company, as of the end of January, is $8,079,945.

01:52PM  13  This month, in fact it was posted on the internet this morning,

01:52PM  14  the company has incurred further costs of $500,000 in Federal

01:52PM  15  Election Commission fines and legal fees because of Kao's

01:52PM  16  political fraud.

01:53PM  17          Mr. Kao's claim of rebirth and enlightenment also run

01:53PM  18  contrary to his conduct before the Hawaii judiciary over the

01:53PM  19  past three years.  In the same state court case that led to his

01:53PM  20  disassociation from the company, Mr. Kao has been found and

01:53PM  21  held in contempt of court three times in 2024 alone.

01:53PM  22          The contempt orders arose from Martin's attempted end

01:53PM  23  around the Court's rulings against him related to the

01:53PM  24  garnishment of rental proceeds for two luxury properties owned

01:53PM  25  by Kao and his wife, Tiffany Lam -- one worth over 6 million in

01:53PM   1   Kahala and the other worth several million in Hawaii Loa Ridge.

01:53PM   2            After Mr. Kao refused to comply with the Court's

01:53PM   3   orders in that case, the Court found Mr. Kao in contempt of

01:53PM   4   court entered on May 2, 2024.  The Court's findings that Kao

01:53PM   5   engaged in bad faith and they stated:

01:53PM   6            "The Court views Mr. Kao's behavior as delaying the

01:54PM   7   proceedings in bad faith so that he can engage in evasive

01:54PM   8   behavior... The Court therefore finds that Kao had violated the

01:54PM   9   Court order and finds that Kao in contempt for violating that

01:54PM  10   order... Kao lacked a good faith excuse or reasonable basis for

01:54PM  11   failing to comply with the Court's order...  Consequently, the

01:54PM  12   Court finds that Kao's contempt -- Kao's conduct in refusing to

01:54PM  13   comply with the Court's order was 'entirely without color' and

01:54PM  14   advanced 'for reasons of harassment and other improper

01:54PM  15   purposes.'"

01:54PM  16            A month later, after he did not comply with the court

01:54PM  17   order, on June 13, 2024, the Court issued a second contempt

01:54PM  18   order.  Mr. Kao was found in contempt of court with the Court

01:54PM  19   finding as follows:

01:54PM  20            "The Court finds that Kao is in violation of the

01:54PM  21   Court's Contempt Order... Despite these repeated reminders and

01:54PM  22   efforts to compel Defendant Kao's compliance with the Court's

01:55PM  23   Contempt Order, Defendant Kao has refused to comply with the

01:55PM  24   Court's Contempt Order, just as he refused to comply with the

01:55PM  25   Court's prior orders which ultimately led to the Court's

01:55PM  1  Contempt Order.  This Court bent over backwards to try to be

01:55PM  2  fair to Defendant Kao.  But with his record of constant

01:55PM  3  evasion, no effort to try to lend any cooperation, recognition

01:55PM  4  that he had an enormous judgment debt, and doing everything to

01:55PM  5  avoid paying every penny, this Court is not able to issue a

01:55PM  6  ruling that would essentially excuse Defendant Kao and justify

01:55PM  7  his evasive behavior."

01:55PM  8       Defendant Kao was ordered to pay a civil fine to the

01:55PM  9  Court in the amount of $200 per day.

01:55PM  10      After Kao failed to comply with the second contempt

01:55PM  11  order, Kao was again found in contempt of court a third time

01:55PM  12  and entered on November 22, 2024.  The judge found as follows:

01:55PM  13      "The Court... finds that there is a record of

01:56PM  14  extremely evasive conduct by Kao, that his noncompliance with

01:56PM  15  the Court's Contempt Orders is and has been knowing and

01:56PM  16  willful, and that his defense of inability to pay and/or

01:56PM  17  poverty is not well taken given the extreme efforts he has

01:56PM  18  undertaken to avoid compliance of the Court's Contempt Orders."

01:56PM  19      Mr. Kao was ordered to pay a contempt fine of $500 per

01:56PM  20  day under the third contempt order.  Mr. Kao currently owes the

01:56PM  21  circuit court well over $80,000 in civil fines, which he has

01:56PM  22  refused to pay the judiciary to date and he continues to ignore

01:56PM  23  and defy the Court's rulings.

01:56PM  24      Mr. Kao has not made any restitution to the company or

01:56PM  25  to the Hawaii state judiciary in spite of owing or co-owning

01:56PM   1   with family members six properties in Hawaii with a fair market
01:56PM   2   value in excess of $15 million.  Additionally, after his arrest
01:56PM   3   in September 2000, he sold a Beverly Hills condo in June 2021
01:57PM   4   for $1,245,000 and was in the process of selling a Taiwan
01:57PM   5   property valued at $800,000.  We knew about the Taiwan property
01:57PM   6   because Kao illegally had the company pay his personal bills to
01:57PM   7   that attorney.  So in the over $2 million received from these
01:57PM   8   properties, none of it was used to make restitution to the
01:57PM   9   company or to the Hawaii judiciary.  If he was truly remorseful
01:57PM   10  of his actions and all the damages he caused, he would have
01:57PM   11  used the cash and sold as many additional properties that he
01:57PM   12  controlled to pay the court damages.
01:57PM   13          Mr. Kao continues his fraudulent transgressions
01:57PM   14  extending to the Department of Justice.  For his Washington
01:57PM   15  D.C. political fraud case, he was given a public defender
01:57PM   16  because of his claims of insolvency.  We know that throughout
01:57PM   17  2022 and possibly earlier, Kao was receiving $16,000 a month
01:58PM   18  from the Kahala property and $8,100 a month from the Hawaii Loa
01:58PM   19  property.  These were the rentals subject to our garnishment
01:58PM   20  orders which he also refused to acknowledge.
01:58PM   21          In addition to his real estate and rental property
01:58PM   22  income, Kao and his family committed charity fraud and
01:58PM   23  illegally received over $3.1 million cash from the liquidation
01:58PM   24  of a charity asset, a luxury San Francisco condominium on Nob
01:58PM   25  Hill.  These transgressions are a subject of two separate

01:58PM   1   lawsuits the company has filed -- excuse me, for charity fraud
01:58PM   2   and fraudulent property transfers.  From the discovery in those
01:58PM   3   cases, the stocks owned in the Kao family Ameritrade account
01:58PM   4   are worth over $4 million in 2021.  I had my staff update the
01:59PM   5   value of those stocks.  As of the end of the year they were
01:59PM   6   worth more than $9 million.
01:59PM   7          With Kao's extensive resources, he should have been
01:59PM   8   using them to pay the multiple court awards totalling
01:59PM   9   $8.2 million as part of his path to rehabilitation and
01:59PM  10   respecting laws and justice.  Instead, he is lavishing himself
01:59PM  11   by attending Harvard classes which we estimate cost in excess
01:59PM  12   of $30,000.
01:59PM  13          Based on all of the above and much more, PacMar
01:59PM  14   believes Mr. Kao deserves the maximum jail sentence allowable
01:59PM  15   by law.  His lack of providing any restitution to those damages
01:59PM  16   from his crimes demonstrates his lack of remorse or accepting
01:59PM  17   responsibility for his transgressions.  Far from being a
01:59PM  18   first-time offender, he has pled guilty to three separate
01:59PM  19   indictments and there are many more crimes that he has
01:59PM  20   committed and continues to commit that he has not been held
01:59PM  21   accountable for yet.  His request to the Court for a reduced
02:00PM  22   sentence citing his rehabilitation in my opinion is just a
02:00PM  23   continuing scam.  Thank you.
02:00PM  24          THE COURT:  Thank you very much.  I appreciate you
02:00PM  25   taking the time and those also from your company who came here

02:00PM   1   today.  You obviously put a lot of time and thought in your

02:00PM   2   statement, and I have listened to all of it.  So I thank you,

02:00PM   3   thank you very much.  Good luck to you, sir.

02:00PM   4          MR. NOLAN:  Thank you, Your Honor.  There is not a lot

02:00PM   5   more for the government to say.  The Court clearly has done its

02:00PM   6   reading, it's read everything, it had a comprehensive report by

02:00PM   7   the probation office, really an exceptional report in my view.

02:00PM   8   The Court has gone through aggravators and mitigators, but the

02:00PM   9   Court has distilled it.  It's greed, deceit and entitlement.

02:00PM   10  And me saying that ten more times doesn't make it any worse.

02:01PM   11         I do just want to take a moment though to recall that

02:01PM   12  about ten days before Mr. Kao submitted the first application,

02:01PM   13  the one for $10 million, this county was put under a

02:01PM   14  Stay-At-Home order.  So the world had come to a standstill in

02:01PM   15  March of 2020.  We didn't know what was happening.  We were

02:01PM   16  wiping down groceries with bleach wipes because we didn't

02:01PM   17  understand what was going on around us.

02:01PM   18         And while that was happening, we were trying to figure

02:01PM   19  out, How do we move forward?  How do we engage in business?

02:01PM   20  How do we do our work?  How do we take care of our kids?  How

02:01PM   21  do our kids get schooled?  I think it's fair to say that we

02:01PM   22  were all in some state of relative panic.  And so the

02:02PM   23  government's response at the municipal level, at the state

02:02PM   24  level, at the national level was to essentially shut us down

02:02PM   25  and shut down the economy.

02:02PM   1              This is a state full of small businesses, not unlike
02:02PM   2    many other states, but mom-and-pop shops, mom-and-pop
02:02PM   3    restaurants, family-owned institutions that have been around
02:02PM   4    for generations, new businesses struggling to make it for the
02:02PM   5    first time.  And their customer base was just wiped out, and
02:02PM   6    their employee base was wiped out.  Most of us were told to
02:02PM   7    stay at home, unless you performed an essential function.
02:02PM   8              And so the government through congress decided to pour
02:02PM   9    billions of money through the economy to pump that out as
02:02PM  10    quickly as it could to save the economy, so that employers who
02:03PM  11    had no income coming in or greatly reduced income coming in
02:03PM  12    could pay their employees; so their employees could buy food,
02:03PM  13    spend some money in their local neighborhoods, and do the
02:03PM  14    things we do every day and take for granted even when the
02:03PM  15    economy is bad.  It was about as bad as things could get.
02:03PM  16              And so congress enacted the PPP program, Paycheck
02:03PM  17    Protection Program, for just that purpose; so that employers
02:03PM  18    could pay their employees, keep them on the payroll, hopefully
02:03PM  19    ride out the storm.  We never thought it would be as long as it
02:03PM  20    lasted.  We had some reprieves and thought we were done and
02:03PM  21    then we went back into it, and congress poured more and more
02:03PM  22    money in.
02:03PM  23              So along comes Mr. Kao right at the beginning of this
02:03PM  24    program.  In fact, his first submission for the first loan was
02:04PM  25    actually done on a form that was changed that very night, and

02:04PM   1    he was asked to redo it on the current form, because the SBA

02:04PM   2    was scrambling to put together this program.  And it did put

02:04PM   3    together this program, and it gave -- it told the banks to push

02:04PM   4    out the money, and it said it was going to guarantee all of

02:04PM   5    those loans up to $10 million.  And so while mom-and-pop shops

02:04PM   6    around the state and around the country were applying for

02:04PM   7    10,000 or 25,000, Mr. Kao decided that he would apply for 10

02:04PM   8    million.

02:04PM   9            Now Mr. Kao's company at the time named Navatek was

02:04PM  10    eligible for a fraction of that.  It could have applied for its

02:04PM  11    --  based on its 140-or-so employees and done the formula, the

02:04PM  12    formula that took into account the salaries of those employees

02:04PM  13    up to a hundred thousand, and his company would have been

02:05PM  14    entitled to couple million, maybe a little more, maybe a little

02:05PM  15    less depending on how you really calculate it, he could have

02:05PM  16    done that.  He didn't need to do it because he was a defense

02:05PM  17    contractor.  And even if there was a slight disruption in the

02:05PM  18    money that flowed, that money continued to flow.

02:05PM  19            His customer didn't go away because his primary

02:05PM  20    customer was the U.S. Government.  And that company that was

02:05PM  21    founded by Mr. Loui's father, or at least the related company

02:05PM  22    was, and then grown by Mr. Loui, is a valued defense contractor

02:05PM  23    primarily to the navy.  They deal with boats and ships and

02:05PM  24    hulls and all sorts of things.  Frankly, I don't understand.

02:05PM  25            They employed 140 people, about a hundred in Hawaii at

02:05PM  1    the time of that loan.  Many of the jobs were high paying
02:05PM  2    engineer jobs, as you might expect.  And so he didn't need the
02:06PM  3    money for his company, but he was eligible for a fraction.  But
02:06PM  4    that wasn't good enough.  So he put down 400-some-odd
02:06PM  5    employees, when it was 140.  They did the calculation, it was
02:06PM  6    very simple, it came out above the 10 million max; he got the
02:06PM  7    10 million max.

02:06PM  8            And then he went to another bank and he lied to that
02:06PM  9    bank.  He said, oh, we're entitled to this.  He used the
02:06PM  10   same -- this time he did stick with his 140 employees; but as
02:06PM  11   we know, he had already gotten 10 million to cover those 140
02:06PM  12   and then a bunch of imaginary employees.  So he lied to them
02:06PM  13   and he got his 2.8 million.  He used a different -- he had a
02:06PM  14   number of LLCs related, they were not entitled to different
02:06PM  15   pots of money, they were entitled to -- there was one group of
02:06PM  16   employees, no matter which payroll they were on, and that's how
02:07PM  17   he considered it as well.

02:07PM  18           So he got the 2.8 million through deceit, through
02:07PM  19   lies.  And then he doctored -- he actually altered the
02:07PM  20   promissory note after the fact so that some people, not
02:07PM  21   everyone in his organization, because some people knew, but
02:07PM  22   some people, perhaps accountants who knew about the earlier
02:07PM  23   PPP, perhaps others wouldn't see.  So he took that note and he
02:07PM  24   literally on his computer redacted in white all references to
02:07PM  25   the PPP program.  So it looked like a standard SBA note to hide

02:07PM    1    and conceal on top of his lies.

02:07PM    2           And then he went to a third bank, it was the second

02:07PM    3    institution in this state, and he lied to them and they pushed

02:07PM    4    back and he lied again.  And finally they denied it.  They

02:07PM    5    caught him.

02:08PM    6           And so he did all those things when he didn't need to

02:08PM    7    in the first place.  He took $2 million and transferred it to

02:08PM    8    his own coffers.  In part, that 2 million we don't trace it to

02:08PM    9    the Kahala home, that's case number two, but it was in there

02:08PM   10    and it was for evaluation purposes when Merrill Lynch, B of A

02:08PM   11    looked at his application.

02:08PM   12           So he did all those things to the detriment of others

02:08PM   13    who really couldn't pay their employees, who couldn't pay their

02:08PM   14    rent or mortgage for their business, which was one of the other

02:08PM   15    eligible categories.  He didn't need any of that money.  And

02:08PM   16    while doing this, as the Court said, he used influence.  He

02:08PM   17    touted his connections to politicians in this state and beyond

02:08PM   18    and their staffs.  There were implied threats to the first bank

02:08PM   19    that, oh, they would be in touch, they would call, did he need

02:09PM   20    to call them on that bank, one of our largest banks, right?

02:09PM   21           Banks don't want senators being told that they are not

02:09PM   22    abiding by the dictates of a federal program.  They were just

02:09PM   23    struggling with, what do we have to verify?  He was one of the

02:09PM   24    first applicants.  How do we do this?  What standards do we

02:09PM   25    apply?  And he was pushing, pushing, pushing, but the Court

02:09PM   1    knows that.

02:09PM   2          The emails are replete.  The company emails are

02:09PM   3    replete with him and some of his colleagues joking about what

02:09PM   4    they were doing, making fun of it, making fun of others.  It

02:09PM   5    was really terrible stuff, appalling stuff.

02:09PM   6          And so amazingly and incredibly, during that same very

02:09PM   7    time period, he applies -- in the second case, he applies to

02:09PM   8    buy yet another property, and the Court has his financial

02:10PM   9    assets, a $4.5 million property in Kahala.  Pretty nice.  And

02:10PM   10   he wants a loan, so he gets that through Merrill Lynch and B of

02:10PM   11   A and he gets $3 million.  In doing that, he wants -- he again

02:10PM   12   sat down at his computer and he doctored his investment

02:10PM   13   portfolio, and he represented that he had much more money than

02:10PM   14   he did.  Those were material statements.  Whether or not he

02:10PM   15   would have qualified, that bank was going to look at that

02:10PM   16   because that's important.  What does he have?  Does he have the

02:10PM   17   ability to pay?  Can we go against his other assets?  The stuff

02:10PM   18   that is just standard business practices for banks.

02:10PM   19         Why he did that, I don't know.  It makes no sense.

02:10PM   20   Did he need another house?  He had many already in places like

02:10PM   21   Beverly Hills and here and Honolulu.  But to actually engage in

02:11PM   22   that kind of conduct as a professional, he worked -- I don't

02:11PM   23   know whether he has a law degree or not, but he was a business

02:11PM   24   man leading one of the leading companies, maybe not the

02:11PM   25   biggest, but one of the leading companies in this state.  He

02:11PM  1    was sophisticated, he worked for an accounting firm for years

02:11PM  2    before he joined Mr. Loui.  There is no reason he should have

02:11PM  3    done this.  Absolutely no reason.  It was greed, it was deceit,

02:11PM  4    and it was entitlement.  But the Court knows that.

02:11PM  5           So here's what the government recommends.  First of

02:11PM  6    all, the government recommends the low end of the guidelines,

02:11PM  7    87 months.  And we are recommending the low end of the

02:11PM  8    guidelines because we have taken into consideration his

02:12PM  9    post-offense rehabilitative conduct and his volunteering and

02:12PM  10   all of that.  So that's where the government gives him credit

02:12PM  11   for that.  It's ultimately of course up to the Court.

02:12PM  12          I will say, and I've been granted authority to say

02:12PM  13   this by the folks in DC who debriefed him, because you've heard

02:12PM  14   about that, they debriefed him extensively, he provided a lot

02:12PM  15   of information.  No investigation has been launched as a result

02:12PM  16   of those debriefings.  Whether something does, I don't know.

02:12PM  17   And if something does and the prosecutors in Washington are

02:12PM  18   involved with that, and they believe he's entitled to some

02:12PM  19   cooperation credit down the road for that, then they will call

02:12PM  20   me and we will make a decision collectively.  And if he is

02:12PM  21   entitled to it, we will bring the issue back to the Court of

02:13PM  22   course.

02:13PM  23          But from the government's perspective, the Court

02:13PM  24   certainly can take into consideration his debriefings under the

02:13PM  25   statutory sentencing factors, but it did not amount to

02:13PM   1   substantial assistance.

02:13PM   2           All right, so back to the 87 months.  The government

02:13PM   3   defers to the Court on supervised release; that's the Court's

02:13PM   4   resources through its probation office.  With regard to the

02:13PM   5   rest, the forfeiture the Court has already articulated it is

02:13PM   6   $12,841,490 that should be payable to the Small Business

02:13PM   7   Administration.  There is a forfeiture order already in the PPP

02:13PM   8   case for that -- it should be that same amount.  And the Court

02:14PM   9   has already ordered the forfeiture of the over 10 million that

02:14PM  10   the government seized pursuant to warrant from his own

02:14PM  11   accounts, 2 million, and his company's accounts somewhat north

02:14PM  12   of 8 million.  And he will get credit for that toward that

02:14PM  13   forfeiture money judgment of course.

02:14PM  14           With regard to the fine, the government advocates for

02:14PM  15   a $1 million fine.  I mean, Mr. Loui went through some of his

02:14PM  16   assets, the probation has gone through some of his assets, the

02:14PM  17   nature of the crime, I'm not going to belabor it, but the

02:14PM  18   government feels this is one of those relatively rare cases

02:14PM  19   where a fine is appropriate.  And we suggest the top of the

02:14PM  20   guideline, 1 million.

02:14PM  21           I know Ms. Yamaga will have something to say about the

02:14PM  22   criminal forfeiture order entered in the mortgage fraud case

02:15PM  23   and of course you'll listen to her on that.  From the

02:15PM  24   government's perspective, and I do apologize we should have

02:15PM  25   gotten that in earlier, but it's a placeholder, there is no

02:15PM  1  doubt that the government is entitled to forfeiture of the

02:15PM  2  proceeds of that fraud, which are at least 3 million, and

02:15PM  3  that's what came out of that.

02:15PM  4      And the government feels the law is very clear,

02:15PM  5  provided some additional case law that Ms. Yamaga today just

02:15PM  6  moments before, that made clear that the government also gets

02:15PM  7  the appreciation prorated in that house for two-thirds of bank

02:15PM  8  money fraudulently obtained bought that house, one-third of

02:15PM  9  other money, the Kao's money, bought that.

02:15PM  10     But what the Court has entered, from the government's

02:15PM  11 perspective, is a placeholder until we have a foreclosure and a

02:15PM  12 sale.  We just felt, why speculate, why estimate when there is

02:16PM  13 a state process that's going to come up with real numbers.

02:16PM  14 Now, the county says it's worth 7.2, 7.3 million, we'll see

02:16PM  15 what it sells for.

02:16PM  16     I will point out that PacMar has obviously submitted

02:16PM  17 to the probation office a request for restitution.  The

02:16PM  18 probation office has looked at that, I've discussed it with the

02:16PM  19 probation office, PacMar has said to me they would like a

02:16PM  20 restitution hearing so that they can prove up restitution.

02:16PM  21 Essentially, what we are talking about are legal bills, legal

02:16PM  22 costs incurred in responding to subpoenas we issued here for

02:16PM  23 this investigation specific to the PPP case, I think.  And the

02:16PM  24 probation office didn't feel that they could come up with a

02:16PM  25 number based on the submissions.

| | | |
|---|---|---|
| 02:16PM | 1 | The government is really not in a better position than |
| 02:17PM | 2 | the probation office, and so I've told PacMar through its |
| 02:17PM | 3 | counsel that it really needs to parse the legal bills and put |
| 02:17PM | 4 | them in piles so that the appropriate PAR can be considered by |
| 02:17PM | 5 | the Court.  If the Court is inclined to set a restitution |
| 02:17PM | 6 | hearing, it is, of course, my hope that if you do set a |
| 02:17PM | 7 | restitution hearing that counsel, PacMar, the government, with |
| 02:17PM | 8 | help from the probation office, will come up with an agreed |
| 02:17PM | 9 | upon number for the Court's consideration. |
| 02:17PM | 10 | THE COURT:  So on that, I have a couple of questions. |
| 02:17PM | 11 | I didn't want to interrupt you, but if you wanted to finish up |
| 02:17PM | 12 | I'm happy to do that.  So my questions are threefold.  It has |
| 02:17PM | 13 | to do with the fine, it has to do with PacMar's request for |
| 02:17PM | 14 | restitution, and I just have a question how come there is no |
| 02:17PM | 15 | investment information in terms of Mr. Loui had mentioned that |
| 02:17PM | 16 | he had all of these investment assets.  I didn't see any of |
| 02:18PM | 17 | that.  I mean, I see the two Mercedes, the Ferrari, the Rolls |
| 02:18PM | 18 | Royce and then all of this luxury real estate. |
| 02:18PM | 19 | So the dilemma I find myself in in a fine is that I |
| 02:18PM | 20 | know that there are several -- I'm personally aware of, because |
| 02:18PM | 21 | it's in the federal court as a civil lawsuit, one.  So if there |
| 02:18PM | 22 | was any chance of recovering any kind of damage award, they |
| 02:18PM | 23 | wouldn't be able to touch the money that he would have to pay |
| 02:18PM | 24 | towards the fine, because that goes to the government, and I |
| 02:18PM | 25 | certainly couldn't double dip if PacMar is given a restitution |

02:19PM  1   amount that would then be an offset or a setoff, or what have

02:19PM  2   you, that they wouldn't be able to recover those amounts.

02:19PM  3        I'm just trying to figure out on different tracks.  I

02:19PM  4   agree with you that this is one of those rare cases where a

02:19PM  5   fine makes sense, except for the fact that you have all of

02:19PM  6   these other victims that are out there that are seeking civil

02:19PM  7   remedies for the harm that's been done to them.  And the

02:19PM  8   dilemma I find is is it just punishment, so there is an

02:19PM  9   argument for that.  But yet does it then thwart ultimately any

02:19PM  10  kind of recompense to actual victims?

02:19PM  11        MR. NOLAN:  Right.  No, I appreciate the Court's

02:19PM  12  question and observations because that's true.  One reason not

02:19PM  13  to impose a fine here is that PacMar is looking to recover, the

02:20PM  14  SBA is looking to recover, Bank of America is looking to

02:20PM  15  recover.  Frankly, we are hindered here because, at least to my

02:20PM  16  knowledge, and certainly the probation office can correct me if

02:20PM  17  things change, but Mr. Kao never provided a financial

02:20PM  18  disclosure.  And I'm seeing the probation office confirming it.

02:20PM  19        He was asked to provide one, of course.  He didn't

02:20PM  20  sign a plea agreement so I don't have a contractual, right, but

02:20PM  21  in the normal course the probation office asked for that.  And

02:20PM  22  we only have the information -- I believe it goes back to the

02:20PM  23  bail reports.  I don't know if the probation office was able to

02:20PM  24  get more, but Mr. Kao declined to tell the probation office, in

02:20PM  25  response to this request, as to what he has out there.

| | | |
|---|---|---|
| 02:20PM | 1 | So the government certainly understands that the Court |
| 02:20PM | 2 | thinks it prudent, given all his outstanding forfeiture |
| 02:21PM | 3 | judgments, given all of his outstanding judgments in the state |
| 02:21PM | 4 | and arbitration proceedings, and given what the restitution |
| 02:21PM | 5 | judgments will be in this case, if the Court decides not to |
| 02:21PM | 6 | impose a fine. |
| 02:21PM | 7 | THE COURT:  Yes.  So that's my question with regard to |
| 02:21PM | 8 | the fines.  That makes sense about the financial disclosure. |
| 02:21PM | 9 | As I read in the presentence report, it's publicly available |
| 02:21PM | 10 | information that was provided, obviously, what you do a real |
| 02:21PM | 11 | estate -- |
| 02:21PM | 12 | MR. NOLAN:  Sure. |
| 02:21PM | 13 | THE COURT:  -- look it up in the commuter with regard |
| 02:21PM | 14 | to that and with regard to the automobiles and the outstanding |
| 02:21PM | 15 | loans.  So that's what would show up.  And there was a report |
| 02:21PM | 16 | of, even though there were all these properties, who was on the |
| 02:21PM | 17 | deed.  Okay, so that -- I was just wondering, somebody with |
| 02:21PM | 18 | these assets, I imagine would have an investment account and |
| 02:22PM | 19 | Mr. Loui mentioned it, but that makes sense.  Okay. |
| 02:22PM | 20 | MR. NOLAN:  Right.  So Mr. Loui has been able to do a |
| 02:22PM | 21 | better job than the government at the moment on some of that. |
| 02:22PM | 22 | I, of course, haven't verified that information with regard to |
| 02:22PM | 23 | investment accounts and the like. |
| 02:22PM | 24 | THE COURT:  They have all those civil actions across |
| 02:22PM | 25 | the street too, so I'm sure they have gotten a lot of |

02:22PM   1   information from that.

02:22PM   2              MR. NOLAN:  And I anticipate of course that after we

02:22PM   3   have judgments from the court that our civil division will

02:22PM   4   start -- will seek leave of court to conduct some discovery and

02:22PM   5   pursue assets out there as well.  The IRS has a lien on that

02:22PM   6   Kahala house.  I think that's in the PSR.  It's somewhere north

02:22PM   7   of a million dollars.  They are a codefendant in the -- or a

02:22PM   8   party in the foreclosure actions.

02:22PM   9              So that's the recommendation of the government.  I'm

02:22PM  10   happy to answer any further questions.

02:22PM  11              THE COURT:  No.  Thank you very much.  I appreciate

02:22PM  12   that.

02:23PM  13              Mr. Bakke.

02:23PM  14              MR. BAKKE:  Your Honor, could I have one moment to

02:23PM  15   consult with the probation officer?  I have a question.

02:23PM  16              THE COURT:  You may.

02:23PM  17              Mr. Bakke, I'm sorry to interrupt.  We have been going

02:23PM  18   for almost an hour.  I think it's fair to the court reporter

02:23PM  19   that we take a brief recess.  Could you consult and then just

02:23PM  20   let Ms. Cortez know when you are ready to proceed and we will

02:23PM  21   take like a ten-minute recess.  Thank you very much.  We stand

02:23PM  22   in recess.

02:23PM  23              (Proceedings were recessed at 2:23 p.m. to 2:32 p.m.)

02:32PM  24              THE COURT:  The record will reflect the presence of

02:32PM  25   counsel and Mr. Kao and Ms. Nieling.

02:32PM  1            So, Mr. Bakke.

02:32PM  2            MR. BAKKE:  Yes, Your Honor.  Thank you.

02:32PM  3            Your Honor, before I get started, on page 23 of the

02:33PM  4     presentence report it talks about criminal history.  And I

02:33PM  5     believe that on paragraph 97, if the Court had earlier said

02:33PM  6     today that the defendant had a prior conviction.  But that was

02:33PM  7     not a conviction under state law, that was a deferral, and the

02:33PM  8     case was dismissed.  So there was never any conviction.  I just

02:33PM  9     wanted to clarify that.

02:33PM  10           THE COURT:  Okay, thank you.

02:33PM  11           MR. BAKKE:  Your Honor, when it comes to sentencing we

02:33PM  12    can sit here all day and talk about what a person did.  And

02:33PM  13    that obviously is where we have to start, okay.  But that is

02:33PM  14    not the end of the story, and we have to balance that under the

02:33PM  15    3553(a) factors with the mitigating factors.

02:33PM  16           And, in fact, just the general life history of a

02:33PM  17    person, because although people have to be held to answer for

02:33PM  18    their individual acts, individual actions don't always

02:34PM  19    completely define a person for their whole life.  And

02:34PM  20    especially at Mr. Kao's age, he hasn't led a life of crime.

02:34PM  21    And these allegations that have brought him here are more types

02:34PM  22    of crimes of opportunity and things like that, as opposed to an

02:34PM  23    orchestrated long running -- this is not a Ponzi scheme, this

02:34PM  24    isn't --

02:34PM  25           THE COURT:  It's not a Ponzi scheme, but it's very

| | | |
|---|---|---|
| 02:34PM | 1 | involved and it was deliberate.  This is not a bank teller who |
| 02:34PM | 2 | at Christmas maybe is a single mother and somebody deposits |
| 02:34PM | 3 | $5,000 of cash and in a moment of weakness she takes the cash. |
| 02:34PM | 4 | That's understandable.  This took planning, this took |
| 02:34PM | 5 | leadership.  This was not a matter of just putting in one piece |
| 02:34PM | 6 | of paper or making a phone call. |
| 02:34PM | 7 | So I understand what you are saying, it's not a Ponzi |
| 02:34PM | 8 | scheme where you're reaching out -- but it was quite |
| 02:34PM | 9 | sophisticated. |
| 02:34PM | 10 | MR. BAKKE:  Your Honor, with all due respect, we |
| 02:35PM | 11 | completely disagree with that in a sense of I went through that |
| 02:35PM | 12 | same situation.  Nobody this side of the bar had to deal with |
| 02:35PM | 13 | employees, the COVID, the paying your rent, everything like |
| 02:35PM | 14 | that.  It was chaos.  The problem is Mr. Kao took advantage of |
| 02:35PM | 15 | that.  And as we know across the country many people took |
| 02:35PM | 16 | advantage of it that most didn't have any criminal history. |
| 02:35PM | 17 | But when they saw it there and they saw that opportunity they |
| 02:35PM | 18 | took it, and it was done over a relatively short period of |
| 02:35PM | 19 | time.  But I do agree with the Court that, yes, you kind of |
| 02:35PM | 20 | have had to know what you were doing, you know. |
| 02:35PM | 21 | THE COURT:  And you kind of had to have the ability to |
| 02:35PM | 22 | threaten that you could use relationships with senators and |
| 02:35PM | 23 | congresswomen and throw your weight around with regard to that. |
| 02:35PM | 24 | That's an aspect of this. |
| 02:35PM | 25 | MR. BAKKE:  That's correct.  Mr. Kao actually had that |

02:35PM    1    weight, so to speak, to throw around.

02:35PM    2            THE COURT:  Right.

02:35PM    3            MR. BAKKE:  So but the real problem started with him

02:36PM    4    even coming up with the stupid idea that we can get a bunch of

02:36PM    5    money here.  And like the prosecutor said, he would have been

02:36PM    6    entitled to something, it looks like, under the regular rules.

02:36PM    7    It's just the way it was calculated.  And there were other

02:36PM    8    companies, if you recall.

02:36PM    9            THE COURT:  The way it was calculated because of

02:36PM   10    abject fraud.  He took numbers of individuals that you said

02:36PM   11    were on your payroll and you inflated it by a factor of

02:36PM   12    several, not double.

02:36PM   13            MR. BAKKE:  Absolutely.  But I think what Mr. Nolan

02:36PM   14    and I were kind of getting at is this was so stupid because it

02:36PM   15    didn't have to be done.  He could have just gone in and said,

02:36PM   16    you know what, I legitimately need this -- even though I have a

02:36PM   17    big company he still could have qualified for something.  But

02:36PM   18    that goes back to greed and despair.  Why didn't he just apply

02:36PM   19    normally, instead of trying to milk it for more than the

02:36PM   20    program --

02:36PM   21            THE COURT:  Well, you could get six times more than

02:36PM   22    apparently he might have been able to qualify for.  Although, I

02:37PM   23    don't know if he really qualified for it because it wasn't

02:37PM   24    meant for people who had like Uncle Sam as the provider.  But

02:37PM   25    even assuming that to be true, we're talking -- well, Mr. Nolan

02:37PM 1    had mentioned somewhere in the neighborhood of $2 million -- we

02:37PM 2    are talking about almost $13 million.

02:37PM 3         MR. BAKKE:  Absolutely, correct, and that's where the

02:37PM 4    crime comes in, Your Honor.  So I'm trying to get into -- you

02:37PM 5    know, about this being a long, drawn out, thought out process.

02:37PM 6    This was something that just came up in a very short period of

02:37PM 7    time, there weren't a lot of rules, it was ripe for abuse,

02:37PM 8    which we found out later through all the cases across the

02:37PM 9    country, and he absolutely has to be held accountable for that.

02:37PM 10        But I'm trying to put it in kind of a framework like

02:37PM 11   we didn't know what was going on.  You had places like Ruth's

02:37PM 12   Chris, Shake Shack, you had major companies all applying for

02:37PM 13   these maximum $10 million loans that they qualified evidently

02:37PM 14   for under the rules.  But when the public kind of heard about

02:38PM 15   it, a lot of those companies let the loan go because of the

02:38PM 16   optics.  It looked bad, why does this big company get all this

02:38PM 17   money and the mom-and-pop shops hardly get anything?

02:38PM 18        Again, not any excuses.  I'm not making any excuses.

02:38PM 19   I'm just trying to put it in a little bit of context because we

02:38PM 20   are talking about Martin's overall character of his whole life

02:38PM 21   that this was a very short period of time.

02:38PM 22        Now, he was very busy during that short period of

02:38PM 23   time, but he had 50 years before that.  He was a good guy,

02:38PM 24   father, all of that stuff.  He was successful.  He had the

02:38PM 25   Ferraris -- he had more than one Ferrari, he had the

02:38PM   1   properties, he was living a successful lifestyle that came from

02:38PM   2   legitimate work.  He is not a drug dealer or something.

02:38PM   3          So we go through all that and then, all of sudden, now

02:39PM   4   he is greedy and deceitful and everything like that.  And I'm

02:39PM   5   looking at that and going, what changed from Martin and the

02:39PM   6   father and everything to this?  Where did he get lost?  Because

02:39PM   7   he wasn't like that before, and the only thing I can find, Your

02:39PM   8   Honor, is when he got involved with Navatek and Mr. Loui and he

02:39PM   9   went to work for them.  And that --

02:39PM   10          THE COURT:  Wait, wait.  Okay, honestly I got to head

02:39PM   11   you off here.  So you are saying because he started working at

02:39PM   12   this firm, from which he has stolen millions of dollars, that

02:39PM   13   that somehow they made him do it or influenced him to do these

02:39PM   14   actions?

02:39PM   15          MR. BAKKE:  Well, Your Honor, I'm unaware of him

02:39PM   16   having stolen millions of dollars from the company.

02:39PM   17          THE COURT:  Well, it was supposed to go to the

02:39PM   18   company, right?  Didn't he apply for the PPP?  It was not for

02:39PM   19   him personally, he wasn't supposed to personally get the money,

02:40PM   20   correct?

02:40PM   21          MR. BAKKE:  Correct, for the company.

02:40PM   22          THE COURT:  Right.  And he put the company's name on

02:40PM   23   it, and he made representations about the company qualifying

02:40PM   24   for PPP.

02:40PM   25          MR. BAKKE:  Yes.

02:40PM  1          THE COURT:  And so then when those get approved, then

02:40PM  2     that money is supposed to go to the applicant, Navatek.  So I'm

02:40PM  3     kind of losing you with saying, well, yeah, but Navatek really

02:40PM  4     didn't lose any money or there is no evidence of Navatek --

02:40PM  5          MR. BAKKE:  They didn't because they weren't entitled

02:40PM  6     to that money to begin with.

02:40PM  7          THE COURT:  You know what, so I get that.  So you are

02:40PM  8     saying that the whole fraud of this, the only victims then are

02:40PM  9     the taxpayer and the banks?

02:40PM  10         MR. BAKKE:  Correct, Your Honor.

02:40PM  11         THE COURT:  Navatek is not a victim.  Is that the

02:40PM  12     point you are trying to make?

02:40PM  13         MR. BAKKE:  As far as the PPP loan itself, because I

02:40PM  14     got a little lost with Mr. Loui talking about all this other

02:40PM  15     collateral damage that may come, and that may be going to

02:40PM  16     restitution.  But where I was going with this, Your Honor, is

02:41PM  17     not he went to work for the company so he stole money from the

02:41PM  18     PPP loan, because we also have the Washington D.C. case.

02:41PM  19         THE COURT:  Yeah, absolutely, which I am taking into

02:41PM  20     account as 3553(a) factors of sentencing because he is a

02:41PM  21     convicted felon in another matter, and I know generally what

02:41PM  22     that involves.  So that's an additional factor I can take into

02:41PM  23     account in evaluating what an appropriate sentence is.  But I

02:41PM  24     don't make any judgment with regard to what happened there

02:41PM  25     because that's not part of my case.

02:41PM   1                MR. BAKKE:  Correct, Your Honor.  We know that it was
02:41PM   2   campaign fraud, making illegal donations to elected officials.
02:41PM   3                THE COURT:  Correct.
02:41PM   4                MR. BAKKE:  So that's kind of where I'm saying is when
02:41PM   5   Mr. Kao came into Navatek, he was not a businessman, he wasn't
02:41PM   6   experiencing government contracting.  Quite frankly, I don't
02:41PM   7   know how he got 99 percent of the company, why they gave it to
02:41PM   8   him.  It appears because they were happy that he did something
02:42PM   9   good for them.
02:42PM   10               THE COURT:  Well, I don't know and I don't want to
02:42PM   11   make any judgment.  What's your point with regard to --
02:42PM   12               MR. BAKKE:  My point, Your Honor, is when he came in
02:42PM   13   that company was rotten already.  And so he learned from
02:42PM   14   Mr. Loui, he learned from them the way they did things, and the
02:42PM   15   way they did things when he came in was already in place.  You
02:42PM   16   pay people for influence, you throw your weight around, you do
02:42PM   17   those kinds of things.
02:42PM   18               Before this thing, when he started, he wasn't any of
02:42PM   19   that kind of stuff.  But he got in there and that's where he
02:42PM   20   lost his way, Your Honor.  He got into that environment, it was
02:42PM   21   big money, it was relatively easy money, and he loved the whole
02:42PM   22   thing of it.  He loved everyone looking up to him and being the
02:42PM   23   boss and flying to DC and being the big company in Hawaii.  And
02:42PM   24   he just got lost.  He got lost in all of that.  And the money,
02:42PM   25   the Ferrari, the whole thing, right.

02:42PM    1              And that's where I'm just trying to put in a little

02:43PM    2    bit of context that that's where -- he went from a normal guy

02:43PM    3    to this super star in the industry and all the benefits that

02:43PM    4    came with it.  And he got lost, he took advantage of it, and

02:43PM    5    then that brings us to the rehabilitation.  Because as high as

02:43PM    6    he went, he fell just as far.

02:43PM    7              And as the -- Court is aware, I don't need to go

02:43PM    8    through all the rehabilitation, but this was all done on his

02:43PM    9    own.  I mean, to me, and I know the Court has read through

02:43PM    10   everything and the Court really I think in other cases, you

02:43PM    11   really take into consideration the letters, right?  Not because

02:43PM    12   it's a letter from a bank president, it's somebody that really

02:43PM    13   knows him and somebody that can really talk to the person.

02:43PM    14             And I've never seen in a case like this where you have

02:43PM    15   letters from the Cheese Cake Factory from his co-workers, where

02:43PM    16   he spent over two years excelling in a job that many people

02:43PM    17   would say, well, that's so below him.  Obviously, there is

02:44PM    18   nothing wrong with working at the Cheese Cake Factory, but it's

02:44PM    19   not the CEO of Navatek.

02:44PM    20             THE COURT:  Understood.  Understood.

02:44PM    21             MR. BAKKE:  And so those things are looking at -- when

02:44PM    22   I go back to 3553(a)is that he has humbled himself, because he

02:44PM    23   went from kind of the zero to the hundred back down almost to

02:44PM    24   the zero.  And that takes a lot of character and a lot of

02:44PM    25   humbling, and he did well, and he excelled at it.  And I think

02:44PM  1    his values changed.

02:44PM  2            And I remember I told him one time, I went to visit

02:44PM  3    him and he said, oh, look at this Ferrari.  I got this Ferrari.

02:44PM  4    And I go, yeah, but you know what, Martin, what's important now

02:44PM  5    is not what's in your garage, it's who lives in your house.

02:44PM  6    That's where your focus and goals are.  And he just looked at

02:44PM  7    me like, I never thought of it that way.  And he's got a

02:44PM  8    beautiful family, and he put them through hell through all of

02:45PM  9    this, and he'll have to attenuate to that.

02:45PM  10           But it's that kind of situation where, you know -- the

02:45PM  11   Harvard thing.  I was like, what do you mean you got into

02:45PM  12   Harvard?  He didn't even tell me.  I found out --

02:45PM  13           THE COURT:  Did it really cost $30,000?

02:45PM  14           MR. BAKKE:  I don't know how much the tuition is.

02:45PM  15           THE DEFENDANT:  It's about $900 a college credit,

02:45PM  16   graduate credit.  I've taken 20 credits already.

02:45PM  17           THE COURT:  And you took 20 credits.  Thank you.

02:45PM  18   Okay.

02:45PM  19           MR. BAKKE:  Again, it's not one of these cases where

02:45PM  20   we are looking so hard at rehabilitation, because that's, as

02:45PM  21   the Court said, that's just one of the factors.  Just one of

02:45PM  22   them.  But it's also a very important one.

02:45PM  23           Obviously, restitution and all that stuff it sounds

02:45PM  24   like we're probably going to have to have a restitution study

02:45PM  25   to sort that out more.  There's also the $2 million after we

02:46PM  1   are done with court here.  We have to go downstairs because
02:46PM  2   they are going to take the $2 million that is up on the bail;
02:46PM  3   so we are going to have to sort that out more.
02:46PM  4          What I'm really here about now is with Martin because
02:46PM  5   we hear everything, well, he lied, he lied, he lied.  Yeah, no
02:46PM  6   doubt that he lied.  I guess my position is, does it really
02:46PM  7   raise it to that much of an aggravating factor in a situation
02:46PM  8   where really the whole charge is lying?  I mean, everyone that
02:46PM  9   was charged with PPP loans lied.  So it's kind of like that is
02:46PM 10   the crime.
02:46PM 11          THE COURT:  Well, it is the crime.  Fraud is the
02:46PM 12   crime, right?  And then we look at also the amount that the
02:46PM 13   person benefitted by, right?  So I admit to you there was a lot
02:46PM 14   of PPP fraud apparently.  I don't think the statistics will
02:46PM 15   bear out that there were a lot of fraud in excess of
02:46PM 16   $12 million.
02:46PM 17          MR. BAKKE:  I would agree with that.  It's about 1 to
02:47PM 18   2 million and then after that it's like 15 or 20.  It's kind of
02:47PM 19   like not a real gap in the middle from the cases that I saw.
02:47PM 20          THE COURT:  Right.  So this is a pretty egregious case
02:47PM 21   in terms of the amount and also his role.
02:47PM 22          So where are you on what's an appropriate sentence?
02:47PM 23          MR. BAKKE:  Your Honor, I just believe that under the
02:47PM 24   very unique circumstances of this case, especially such as an
02:47PM 25   exemplary post-offense rehabilitation, I don't know where the

02:47PM  1    actual range should be.  But I would recommend that a guideline
02:47PM  2    range of 87 months is more than necessary to comply with the
02:47PM  3    sentencing goals in 3553(a)(2).  How much?  I'll defer to the
02:47PM  4    Court, Your Honor.
02:47PM  5         But with his background, prior to starting at Navatek
02:47PM  6    and ending at Navatek, prior to that he's led a good life, and
02:48PM  7    he's going to come out of this at some point.  We just got to
02:48PM  8    make sure that it's -- and this is the hard job for you, Your
02:48PM  9    Honor, is the Goldilocks, which is we don't want it too hash
02:48PM  10   but not too soft either.  He definitely has to be made an
02:48PM  11   example of, and he has to atone, and he has to pay and all of
02:48PM  12   that.  I just don't know where that perfect bowl of porridge is
02:48PM  13   at the end of the day, but I believe that 87 months is more
02:48PM  14   than necessary.
02:48PM  15        THE COURT:  Okay.  Thank you very much.
02:48PM  16        Ms. Yamaga, is there anything you wanted to add and
02:48PM  17   then I'll give Mr. Kao an opportunity to speak on his behalf.
02:48PM  18        MS. YAMAGA:  Nothing with respect to the sentence.  I
02:48PM  19   just have a comment on the criminal forfeiture.  Do you want me
02:48PM  20   to address that now?
02:48PM  21        THE COURT:  Sure.
02:48PM  22        MS. YAMAGA:  So as Mr. Nolan alluded to, he and I have
02:48PM  23   had a conversation, I just noted that his motion and proposed
02:48PM  24   order was only filed two days ago, which gave me very little
02:49PM  25   time to review it, in particular, little time to review it with

02:49PM   1   Mr. Kao.

02:49PM   2           I can go through the one legal issue that I noted upon

02:49PM   3   my initial perusal, but what I'm ultimately asking the Court to

02:49PM   4   do is to hold off on the final order of judgment and just give

02:49PM   5   me one week to review it with Mr. Kao --

02:49PM   6           THE COURT:  Absolutely.

02:49PM   7           MS. YAMAGA:  -- and we might not make this one

02:49PM   8   objection that I had already highlighted to Mr. Nolan.

02:49PM   9           THE COURT:  Yes, I think so.  And I think the way the

02:49PM  10   proposed order was is that it was just the fact of the

02:49PM  11   forfeiture wasn't entitled to under the case but not the

02:49PM  12   amount.  And then we're going to have to talk about the

02:49PM  13   calculations.  So I just assume that you are not challenging

02:49PM  14   that the government is entitled to forfeiture, but you are

02:49PM  15   really challenging how that's going to be calculated in the

02:49PM  16   final amount.

02:49PM  17           MS. YAMAGA:  That's correct.  It's the appreciation

02:49PM  18   whether that's --

02:49PM  19           THE COURT:  Yes, and that might be a legal issue for

02:49PM  20   me to rule on.

02:49PM  21           MS. YAMAGA:  Yes, Your Honor.  That's the only issue

02:49PM  22   right now.

02:49PM  23           THE COURT:  Right.  And then the other issue that came

02:49PM  24   up is potentially a restitution hearing with regard to

02:49PM  25   Navatek's claim.

| | | |
|---|---|---|
| 02:49PM | 1 | Do you guys have any position on that, or you guys |
| 02:50PM | 2 | want to think about it and we'll have a status conference? |
| 02:50PM | 3 | MS. YAMAGA:  I'd defer to Mr. Bakke. |
| 02:50PM | 4 | THE COURT:  Because that's on his, yes.  You're on the |
| 02:50PM | 5 | bank loan.  Sorry. |
| 02:50PM | 6 | Mr. Bakke. |
| 02:50PM | 7 | MR. BAKKE:  Maybe we can have a status conference on |
| 02:50PM | 8 | it. |
| 02:50PM | 9 | THE COURT:  Okay, very good.  Let's do that because I |
| 02:50PM | 10 | don't have enough information to do that. |
| 02:50PM | 11 | Mr. Kao, you have an opportunity to speak on your |
| 02:50PM | 12 | behalf, it's this time, if you wish.  If you don't, it won't be |
| 02:50PM | 13 | held against you.  Do you wish to say something to the Court? |
| 02:50PM | 14 | THE DEFENDANT:  Yes, Your Honor. |
| 02:50PM | 15 | THE COURT:  All right.  Please. |
| 02:50PM | 16 | THE DEFENDANT:  First of all, good afternoon. |
| 02:50PM | 17 | THE COURT:  Good afternoon. |
| 02:50PM | 18 | THE DEFENDANT:  Thank you for this opportunity to |
| 02:50PM | 19 | address the Court. |
| 02:50PM | 20 | I'm here because I failed.  I'm here today to accept |
| 02:50PM | 21 | responsibility for my mistakes and face the consequences of my |
| 02:50PM | 22 | actions.  So I say before this Court, I'm sorry, I have no |
| 02:50PM | 23 | excuses, I acknowledge my mistakes, and I accept full |
| 02:51PM | 24 | responsibility for the wrongs I've committed. |
| 02:51PM | 25 | I can assure the Court that these statements are not |

02:51PM   1    said impiously, but I also do not believe that anything I say

02:51PM   2    today, however genuine, could ever excuse my actions.  At the

02:51PM   3    end, only my actions can.

02:51PM   4        As I've come to learn through my own epistemology, a

02:51PM   5    life journey towards repentance, any genuine contrition,

02:51PM   6    accountability and acceptance of my mistakes cannot be

02:51PM   7    proclaimed, they must be ensued through and from my actions.

02:51PM   8        A lot of people have said a lot of things about me and

02:51PM   9    the person I was when I committed these offenses.  So today let

02:51PM  10    me tell the Court who I was.

02:51PM  11        I was a naive and ignoramus imposture.  So naive, so

02:52PM  12    ignorant that I had no fear or even understanding of the

02:52PM  13    consequences of my actions.  I didn't think that it was illegal

02:52PM  14    or that lying could be prosecuted as a crime.  I wrongfully

02:52PM  15    thought that fraud would result in no direct physical or

02:52PM  16    visceral financial harm was of any consequence.  None of the

02:52PM  17    crimes I'm here before the Court today were contrived or

02:52PM  18    premeditated.  Instead, everything was by opportunity and by

02:52PM  19    chance.

02:52PM  20        So when the banks told me to just apply as I saw fit,

02:52PM  21    to just apply, however it made sense for my company, don't

02:52PM  22    worry about how you apply, we'll figure it out later.  It

02:52PM  23    doesn't matter how you apply.  It only matters how you spend

02:52PM  24    the money.

02:52PM  25        So I saw opportunities in the chaos with the pandemic.

| | | |
|---|---|---|
| 02:52PM | 1 | And if someone asked questions later -- and I took advantage of |
| 02:53PM | 2 | it.  And if someone asked questions later, I would just deal |
| 02:53PM | 3 | with it at that time.  Both of my offenses occurred around the |
| 02:53PM | 4 | same time, both during the height and frenzy of the pandemic, |
| 02:53PM | 5 | both crimes of opportunity committed without planning or any |
| 02:53PM | 6 | forethought. |
| 02:53PM | 7 | While my mistakes may be borne from situational |
| 02:53PM | 8 | circumstances, it doesn't make -- mean that there is no |
| 02:53PM | 9 | accountability for my actions.  For too long I have allowed |
| 02:53PM | 10 | myself to hide behind the misguided notions of ethics and |
| 02:53PM | 11 | philosophies of consequentialism, that somehow the end justify |
| 02:53PM | 12 | the means.  From the false narrative I've painted in my mind, |
| 02:53PM | 13 | that despite my wrongful conduct and how the company applied |
| 02:53PM | 14 | for the PPP loans, my actions were justified and even to be |
| 02:53PM | 15 | celebrated.  Because in the calendar year 2020, despite COVID, |
| 02:53PM | 16 | despite Hawaii shutting down, despite America shutting down, |
| 02:54PM | 17 | despite the world shutting down, I still spent $16 million. |
| 02:54PM | 18 | $15,850,461 to be exact on my employees' payroll salary and |
| 02:54PM | 19 | wages, most of which are here today.  It included my own salary |
| 02:54PM | 20 | of $1.  I spent far in excess in payroll in 2020 in the 12.8 |
| 02:54PM | 21 | million my company received in PPP loans. |
| 02:54PM | 22 | I know this is not a time to get into the details, but |
| 02:54PM | 23 | I can assure this Court that I did not receive one penny of the |
| 02:54PM | 24 | PPP money. |
| 02:54PM | 25 | THE COURT:  I'm sorry, what about the $2 million that |

| | | |
|---|---|---|
| 02:54PM | 1 | was put into your account? |
| 02:54PM | 2 | THE DEFENDANT:  The $2 million was a distribution for |
| 02:54PM | 3 | my personal capital account.  And the reason he was able to |
| 02:54PM | 4 | trace it was because the PPP funds weren't deposited into the |
| 02:55PM | 5 | company's general business account, which pays payroll, my |
| 02:55PM | 6 | distributions -- |
| 02:55PM | 7 | THE COURT:  But you know you are being held |
| 02:55PM | 8 | accountable for the $2 million that was transferred. |
| 02:55PM | 9 | THE DEFENDANT:  I know.  I understand. |
| 02:55PM | 10 | THE COURT:  And now you're saying that that was money |
| 02:55PM | 11 | you were legally entitled to and that was not part of the crime |
| 02:55PM | 12 | that you committed.  I just want to make sure what you're |
| 02:55PM | 13 | telling me so I understand it correctly. |
| 02:55PM | 14 | THE DEFENDANT:  I'm not sure how to explain the |
| 02:55PM | 15 | semantics other than to say that when we received the PPP |
| 02:55PM | 16 | loans -- |
| 02:55PM | 17 | THE COURT:  Right.  It went into the company account, |
| 02:55PM | 18 | it got commingled -- |
| 02:55PM | 19 | THE DEFENDANT:  It went into the company account, two |
| 02:55PM | 20 | tranches:  One for 10 million and one for 2.8.  When we |
| 02:55PM | 21 | received the 10 million, we moved 8 million of it into a |
| 02:55PM | 22 | company account, a higher bearing interest brokerage account. |
| 02:55PM | 23 | THE COURT:  Okay. |
| 02:55PM | 24 | THE DEFENDANT:  Company account, company account. |
| 02:55PM | 25 | From our general business account where we paid salaries, wages |

02:56PM   1   and everything else, I made a distribution to myself --

02:56PM   2   actually a loan for $2 million.  So I understand the

02:56PM   3   traceability rule and the money being tainted.  So I understand

02:56PM   4   that dynamic, and I don't --

02:56PM   5          THE COURT:  And that's why I'm having a little

02:56PM   6   difficulty swallowing that you didn't take -- you know, I have

02:56PM   7   to say it's interesting because the dilemma I have on

02:56PM   8   sentencing, quite frankly -- well, I'll let you finish and then

02:56PM   9   I'll let you know some of the concerns I have, but go ahead.

02:56PM  10          THE DEFENDANT:  You know all this, you know, the money

02:56PM  11   fungibility issues, how much money I spent on payroll, I agree

02:56PM  12   it all fueled my delusions of self-righteousness.  I even sent

02:56PM  13   emails that are bragging that our company will be the poster

02:56PM  14   child of PPP.  Once the Small Business Administration came in

02:57PM  15   and audited us on how we spent the money, once congress saw

02:57PM  16   that we talked about my congressional influence on

02:57PM  17   relationships, once they saw how we spent -- how much money we

02:57PM  18   spent on payroll, how I hired and created jobs during the

02:57PM  19   pandemic in each of their individual states, this was across 12

02:57PM  20   different states.

02:57PM  21          THE COURT:  So you're like Robin Hood then, you're

02:57PM  22   actually a good guy doing all of these things.  So no matter

02:57PM  23   how you robbed other people to pay for that, you did only good

02:57PM  24   things with it; is that what you are telling me?

02:57PM  25          THE DEFENDANT:  That's what I fooled myself into

| | | |
|---|---|---|
| 02:57PM | 1 | believing. |
| 02:57PM | 2 | THE COURT:  But you understand that's not what |
| 02:57PM | 3 | happened now, or do you still believe that?  That's the problem |
| 02:57PM | 4 | I'm having. |
| 02:57PM | 5 | THE DEFENDANT:  I do believe that.  I do believe that |
| 02:57PM | 6 | I'm here today because I made a mistake.  I justified my own |
| 02:57PM | 7 | actions in how I applied.  And I can confess to the crimes I've |
| 02:57PM | 8 | done, but I cannot accept the things that I didn't do. |
| 02:58PM | 9 | THE COURT:  Like what, that you didn't do, that are |
| 02:58PM | 10 | you going to be held accountable in the sentencing or that |
| 02:58PM | 11 | there are other things that people are mad at you about that |
| 02:58PM | 12 | has nothing -- what we are talking about is a sentencing.  I'm |
| 02:58PM | 13 | trying to figure out an appropriate sentence for you, so I'm |
| 02:58PM | 14 | just -- I just need clarity in my mind.  You said you're not |
| 02:58PM | 15 | responsible for the things that you didn't do. |
| 02:58PM | 16 | THE DEFENDANT:  Right. |
| 02:58PM | 17 | THE COURT:  And I know Mr. Loui talked about a lot of |
| 02:58PM | 18 | different things and that's in state court.  I'm just looking |
| 02:58PM | 19 | at what's in the presentence report. |
| 02:58PM | 20 | THE DEFENDANT:  Okay.  Then I'll disregard what |
| 02:58PM | 21 | Mr. Loui said. |
| 02:58PM | 22 | THE COURT:  Yeah.  I don't know what's going on, and I |
| 02:58PM | 23 | make no judgment with regard to that.  The victims have an |
| 02:58PM | 24 | opportunity to speak, and they can talk about whatever they |
| 02:58PM | 25 | want to talk about because they have a right to talk about how |

02:58PM  1  they believe they've been affected.  So whatever is going for

02:58PM  2  the garnishment and everything else, that's not part of this

02:58PM  3  case.

02:58PM  4           THE DEFENDANT:  I'll disregard that then.  I'll

02:59PM  5  retract that statement.

02:59PM  6           THE COURT:  Great.

02:59PM  7           THE DEFENDANT:  I understand that lying to myself only

02:59PM  8  prolonged my mental anguish, and I could not accept the

02:59PM  9  consequences of my actions because I refused to confront the

02:59PM  10  reality of my own choices, insisting that I was a victim of

02:59PM  11  prosecutorial zeal.

02:59PM  12           Today I truly see and can clearly see that my mistakes

02:59PM  13  and failures, while manifested in my criminal actions before

02:59PM  14  this court today, are so much more embodied in my failure as a

02:59PM  15  CEO and leader in our business community.  There was no book,

02:59PM  16  no manual, no courses you could take -- that I could take to

02:59PM  17  learn how to be a CEO.  For me, all I knew how to do wrongfully

02:59PM  18  was to emulate those I worked for, their behavior.

02:59PM  19           THE COURT:  So you are not in a drug conspiracy where

03:00PM  20  you are working for the mafia, the Mexican cartel.  This was a

03:00PM  21  whole idea of filling out forms to seek money from a government

03:00PM  22  program where you falsified information.  So what you are

03:00PM  23  telling me is that other people made you do this?

03:00PM  24           THE DEFENDANT:  No, I'm not telling you that at all.

03:00PM  25           THE COURT:  Okay.  You are telling me that you are in

03:00PM   1    a culture where somehow you got the message that this is what

03:00PM   2    you are supposed to do, even though nobody told you directly to

03:00PM   3    multiply the number of -- to falsify and multiply by almost a

03:00PM   4    factor of like three, right, from 150 to 400 employees, that's

03:00PM   5    because you were working in this terrible culture?

03:00PM   6              THE DEFENDANT:  No, my culture that I'm referring to

03:00PM   7    is the culture of political influence and the culture of maybe

03:00PM   8    lawless dispensations.  So when I applied for the PPP loans,

03:01PM   9    the reason I applied the way I applied was, at the time we were

03:01PM   10   growing our company exponentially and, the truth be told, the

03:01PM   11   way we grew our company was by making promises to senate

03:01PM   12   appropriations, congressional appropriation members in exchange

03:01PM   13   for creating jobs in their state.

03:01PM   14              So when the pandemic hit, I was asked and directed by

03:01PM   15   members that I served, Will you continue to honor the job

03:01PM   16   commitments you made in my state?  And I couldn't do that.  I

03:01PM   17   could not have done it without the PPP loan.

03:01PM   18              THE COURT:  Without falsifying the PPP loan so that

03:01PM   19   you would get a six-fold kind of money.

03:02PM   20              THE DEFENDANT:  Correct.  So the PPP loan, the way

03:02PM   21   it's calculated, it's based on historical data.

03:02PM   22              THE COURT:  Right.  So I guess what you are saying is

03:02PM   23   you are arguing it was a crime of necessity?  You had a gun to

03:02PM   24   your head and you had to do this because you made these

03:02PM   25   promises and, therefore, you had to commit fraud?  Honestly, I

03:02PM   1   wouldn't recommend you go down this road, I have to tell you,

03:02PM   2   because it's kind of like blaming your mother for all of this.

03:02PM   3   Well, she didn't raise me right and therefore I committed this.

03:02PM   4   I'm sure that's not what you intend to say.

03:02PM   5              THE DEFENDANT:  No, it's not.

03:02PM   6              THE COURT:  Yeah, but it's going down that road.  So I

03:02PM   7   would just ask you to think about what you want to share with

03:02PM   8   me.  Because what I have before me are fairly discreet acts,

03:02PM   9   right, the two loans, the misrepresentations, six times the

03:02PM   10  amount that the company would have been entitled to, according

03:02PM   11  to the government, and then fraudulently conducting yourself

03:03PM   12  with regard to the mortgage loan.

03:03PM   13             So I don't think anybody else applied for those

03:03PM   14  things, and I understand what you are saying about the

03:03PM   15  different tranches, and then you're being paid out and you

03:03PM   16  ordered this thing.  But the way that the information is is

03:03PM   17  that the 2 million that went into your personal account came

03:03PM   18  from the PPP -- came after the PPP money was deposited with the

03:03PM   19  company.

03:03PM   20             So I'm just going to ask you, what's the point that

03:03PM   21  you're trying to make in terms of explaining to me why you did

03:03PM   22  this other than greed -- or it was greed, but you have a reason

03:03PM   23  for it, like people made you do it.

03:03PM   24             THE DEFENDANT:  It's not that someone made me do it.

03:04PM   25  It's -- whether it's greed or personal pride, I was in a

03:04PM    1    position where during COVID a lot of people were asking for a

03:04PM    2    lot of things, and it felt good to be able to meet those

03:04PM    3    expectations -- rightfully or wrongfully.

03:04PM    4         And as much up as I had hoped to placate my

03:04PM    5    benefactors, maybe wrongfully, through using PPP funds, I

03:05PM    6    understand now that -- and I'm not making excuses for what

03:05PM    7    happened, and I apologize if it came out that way; but again, I

03:05PM    8    can't change the past.

03:05PM    9         THE COURT:  Sure.

03:05PM   10         THE DEFENDANT:  All I can do is accept what I've done.

03:05PM   11    I'm reminded of -- as I stand here before you, facing

03:05PM   12    incarceration, losing my freedom, I'm reminded of a quote from

03:05PM   13    one of my favorite books, Man's Search For Meaning.

03:05PM   14    "Everything can be taken from a man but one thing:  the last of

03:05PM   15    the human freedoms.  To choose one's own attitude in any given

03:06PM   16    set of circumstances, to choose one's own way."

03:06PM   17         I am reminded of a speech I once heard by Chief

03:06PM   18    Justice John Roberts where he gave this commencement speech at

03:06PM   19    his son's graduation and he titled it:  I Wish You Bad Luck.

03:06PM   20    It was a facetious title but one with a great message.  The

03:06PM   21    message being that it's often through life's misfortunes and

03:06PM   22    how we respond that we learn life's greatest lessons.

03:06PM   23         As you know, before going back to school, I worked as

03:07PM   24    a dishwasher and cook.  Before that I applied to work at the

03:07PM   25    American Red Cross and was turned down after they did a

03:07PM  1  background check.  The pain of being rejected doing work when

03:07PM  2  you are offering to do it for free is kind of indescribable.

03:07PM  3  But that misfortune turned what was a pride-swallowing siege of

03:07PM  4  washing dishes and mopping floors into a real appreciation for

03:07PM  5  just having a job.  It turned the misfortune of this

03:07PM  6  circumstance to be working at the restaurant for two years

03:07PM  7  where I met some of the most hard-working and resilient people

03:07PM  8  in my life.

03:08PM  9      Although I can't change the past, I can only look at

03:08PM  10  this process in what it's supposed to be for me.  Truth be

03:08PM  11  told, when I was first arrested and released, my mind went to a

03:08PM  12  very dark place.  I kind of immersed myself -- I became a

03:08PM  13  full-blown alcoholic in less than a month.  I immersed myself

03:08PM  14  in readings of Dostoevsky, Franz Kafka, Tolstoy, those dark

03:08PM  15  allegories of the injustices of our justice system seemed to

03:08PM  16  resonate with me at that time.

03:08PM  17      But do I recognize that this process, while it's easy

03:08PM  18  to forget about the rehabilitation side because of how violent

03:08PM  19  the -- I guess the prosecution and punitive side of it is, I do

03:09PM  20  understand that we are not opponents and that we are actually

03:09PM  21  on the same side.  I think you want for me to be the best

03:09PM  22  version of me possible.

03:09PM  23      THE COURT:  I also want you to pay back all your

03:09PM  24  victims.

03:09PM  25      THE DEFENDANT:  Sure.

03:09PM  1          THE COURT:  So I agree.  I really want you to

03:09PM  2    rehabilitate, I want you to experience remorse and ask for

03:09PM  3    forgiveness.  But most of all, the point is, how are you going

03:09PM  4    to make amends to your family for being away from them for

03:09PM  5    years, to the victims, to your former colleagues for the

03:09PM  6    financial harm and distress?

03:09PM  7          You don't have to give me an answer now.  I don't

03:09PM  8    think there is an answer.  But that's what I'm interested in,

03:09PM  9    you figuring that out during your period of incarceration.  And

03:09PM 10    when you come out and you are on supervised release, there is

03:10PM 11    going to be a significant community service component, because

03:10PM 12    I think you owe that to our community, and then you'll be able

03:10PM 13    to work with probation on criminal thinking.  Because that's

03:10PM 14    what you are describing, this idea that you are better than

03:10PM 15    everybody else, that this is somehow doing actions that serve

03:10PM 16    the greater good.  That's criminal thinking, and they can help

03:10PM 17    you with that.

03:10PM 18          THE DEFENDANT:  I understand.  Thank you for

03:10PM 19    listening.

03:10PM 20          THE COURT:  So my dilemma, what I wanted to share with

03:10PM 21    you, Mr. Kao, is that typically people who stand before me,

03:10PM 22    like when you were saying sort of the defense of necessity,

03:10PM 23    that you felt like you were required to do this because you had

03:10PM 24    to keep your company afloat or what have you, but there are

03:10PM 25    people who facilitate pounds of methamphetamine into our state

03:10PM  1   that destroys families, children, many people's lives and has

03:11PM  2   been for decades that literally have come before me, and it's

03:11PM  3   true that the Mexican mafia had taken their sister and shot her

03:11PM  4   in the head and said, If you don't do this and go to the Big

03:11PM  5   Island and facilitate pounds of making coming into the Big

03:11PM  6   Island, we're going to kill your kid and then we're going to

03:11PM  7   kill you.  So that person is still convicted and sentenced to a

03:11PM  8   mandatory minimum of 20 years.

03:11PM  9        And I've got to say if anybody gets to sort of argue

03:11PM  10   necessity, that's a pretty good thing.  What you told me really

03:11PM  11   doesn't move the needle of necessity; so that's the context I'm

03:11PM  12   putting it in.  I'm putting it in the context of the

03:11PM  13   21-year-old that I need to sentence who has been sexually,

03:11PM  14   physically abused in his childhood, his addictions started

03:11PM  15   because his parents started giving him meth when he was nine or

03:11PM  16   10,  your kids' age -- this kid didn't have a chance -- and he

03:12PM  17   has an addiction and he agrees to carry a bag or receive or

03:12PM  18   whatever.  60 months, five years out of his life, mandatory

03:12PM  19   mandatory minimum.  So that's the context I'm looking at it.

03:12PM  20        And then I look at you, and I look at you with this

03:12PM  21   tremendously privileged life, tremendous intelligence,

03:12PM  22   tremendous abilities, you come from a good family, that you

03:12PM  23   have a good family, that you have the kind of material goods in

03:12PM  24   your life, beautiful homes, rental properties, luxury cars.

03:12PM  25   That 21-year-old never had a chance coming out.

03:12PM  1          Now the law is what the law is and I have to sentence
03:12PM  2     him to five years in prison.  How that's going to help him get
03:12PM  3     a GED, hopefully he will get it in prison and then come back
03:12PM  4     out and work with probation and I'll meet with him regularly
03:12PM  5     because no one has ever taught him that this is the way that
03:12PM  6     you need to proceed in the world.  And it's tough and you have
03:12PM  7     all this trauma, whether you can do this.
03:13PM  8          It's really hard.  I hear what you are saying.  I'm
03:13PM  9     sure it has been devastating for you to be indicted and
03:13PM  10    arrested and have to look at serious time.  The dilemma I have
03:13PM  11    is, in many ways, thinking this through, going through the
03:13PM  12    materials, there is a thing called upward departure, and I
03:13PM  13    think the egregious actions by you in this case really could
03:13PM  14    justify an upward departure way past the top of the guidelines
03:13PM  15    in this case.  Because what you did there was no need to do
03:13PM  16    except for entitlement and greed.
03:13PM  17         On the other hand, I think, how does this help the
03:13PM  18    victims, right?  So there is just punishment, that's a
03:13PM  19    component, to prevent you and others from committing this kind
03:13PM  20    of fraud, so the next time there is a government program that
03:13PM  21    people can apply for, people are going to remember Martin Kao
03:14PM  22    and they are going to say, you know what, the government might
03:14PM  23    come after me, it's not worth the risk.
03:14PM  24         But then there is the other component of this, how do
03:14PM  25    we make amends for the victims, and having you come out of

03:14PM  1    prison earlier rather than later, and I know you are able to
03:14PM  2    work, whether it's going to be at the Cheesecake Factory or
03:14PM  3    someplace else, there is an ability to earn money that you can
03:14PM  4    do that may provide some recompense to the victims.  So that's
03:14PM  5    really what I'm weighing on.
03:14PM  6          The government is saying low end of the guidelines,
03:14PM  7    I've told you that I think there is some basis to upwardly
03:14PM  8    depart to you having a significant amount.  When I think about
03:14PM  9    the 21-year-old kid who gets the 60-month mandatory minimum for
03:14PM  10   being stupid, being poor, being traumatized, and then I hear
03:14PM  11   your story, I look at 12.8 million, it's really, really hard to
03:15PM  12   evaluate.  But I need to concentrate on your 3553(a) factors,
03:15PM  13   your personal characteristics, the facts of the offense, the
03:15PM  14   harm that's done to our community by your actions.  And that's
03:15PM  15   what I'm going to do.
03:15PM  16         But I appreciate you sharing your thoughts.  I hope
03:15PM  17   that you will think about what I've said and think about what
03:15PM  18   you can do when you get out in terms of making amends.
03:15PM  19         So the Court is going to state the sentence and
03:15PM  20   reasons for the sentence and then I'll invite the attorneys for
03:15PM  21   any legal objections with regard to the sentence.
03:15PM  22         So the guideline range of imprisonment is 87 to
03:15PM  23   108 months for Counts 1 through 3 and Count 1 and Counts 4
03:15PM  24   through 8 as to each of them.  There are separate counts that
03:16PM  25   could run concurrent or consecutive, which means it would have

03:16PM  1   to be served one at a time.

03:16PM  2           So upon consideration of all the 3553(a) factors, you

03:16PM  3   are committed to the custody of the Bureau of Prisons for a

03:16PM  4   term of 87 months as to each -- let's see, let's make it

03:16PM  5   specific.  As to Counts 1 through 3 under Criminal Number

03:16PM  6   21-61, and Count 1 under Criminal Number 23-03, and Counts 4

03:16PM  7   through 8 under Criminal Number 21-61, to run concurrently.

03:16PM  8           Supervised release of five years as to Counts 1

03:16PM  9   through 3 under Criminal Number 21-61, and Count 1 under

03:16PM  10  Criminal Number 23-03, and three years as to Counts 4 through 8

03:16PM  11  under Criminal Number 21-61.  And that's to run concurrently.

03:17PM  12          No fine.  And I'm making the specific finding that you

03:17PM  13  have financial obligations to the victims.  And rather than

03:17PM  14  imposing a fine that would be paid only to the government after

03:17PM  15  the forfeiture any other financial holdings that you have, I

03:17PM  16  believe should be made available through court means to the

03:17PM  17  victims.

03:17PM  18          Special assessment of $900, $100 for each count for a

03:17PM  19  total of $100.

03:17PM  20          And then the conditions of your supervised release are

03:17PM  21  as follows.  You were previously provided with the 13 standard

03:17PM  22  conditions of release.

03:17PM  23          Do we have a stipulation, Mr. Bakke and Ms. Yamaga?

03:17PM  24          MR. BAKKE:  Yes, Your Honor.

03:17PM  25          MS. YAMAGA:  Yes, Your Honor.

| | | |
|---|---|---|
| 03:17PM | 1 | THE COURT:  So the Court doesn't need to -- those are |
| 03:17PM | 2 | imposed without the Court reading it. |
| 03:17PM | 3 | You must abide by the mandatory and standard |
| 03:17PM | 4 | conditions of supervision including the following: |
| 03:18PM | 5 | You do not have a recent history of substance abuse |
| 03:18PM | 6 | and the offense is not drug related, so I waive the mandatory |
| 03:18PM | 7 | drug test condition. |
| 03:18PM | 8 | You must cooperate in the collection of DNA as |
| 03:18PM | 9 | directed by probation. |
| 03:18PM | 10 | You must report to the probation office in the federal |
| 03:18PM | 11 | judicial district where you authorized to reside within 72 |
| 03:18PM | 12 | hours of the time you are released, unless probation instructs |
| 03:18PM | 13 | you to report to a different probation office or within a |
| 03:18PM | 14 | different time frame. |
| 03:18PM | 15 | You must abide by the follow special conditions: |
| 03:18PM | 16 | You must not possess or use alcohol during the term of |
| 03:18PM | 17 | your supervision.  You must warn any other residents or guests |
| 03:18PM | 18 | that you are prohibited from possessing any alcohol on your |
| 03:18PM | 19 | residence and on your property.  You must submit to alcohol |
| 03:18PM | 20 | testing at the direction of probation. |
| 03:18PM | 21 | You must participate in an outpatient mental health |
| 03:18PM | 22 | treatment program and follow the rules and regulations of that |
| 03:18PM | 23 | program.  The probation officer, in consultation with the |
| 03:18PM | 24 | treatment provider, will supervise your participation in the |
| 03:18PM | 25 | program such as provider, location, modality, duration, and |

03:19PM   1    intensity.

03:19PM   2         Restitution of $12,841,490 is due, less any amounts

03:19PM   3    paid to the Small Business Administration, 721, 19th Street,

03:19PM   4    3rd Floor, Room 301, Denver, Colorado 80202.  Any unpaid

03:19PM   5    balance is to be paid during the period of supervision through

03:19PM   6    a monthly installments of 10% of your gross monthly income

03:19PM   7    commencing 30 days after the start of supervision.  The Court

03:19PM   8    may order this requirement to be changed from time to time, as

03:19PM   9    circumstances warrant, but no court order shall be required for

03:19PM   10   your voluntary agreement to pay more than the court-ordered

03:19PM   11   amount.  Interest will begin accruing 30 days after the start

03:19PM   12   of supervision.  Payments must be made by payroll deduction

03:19PM   13   when applicable.  You must notify the probation officer of any

03:19PM   14   change in your financial circumstances that affect your ability

03:19PM   15   to pay.  Your financial circumstances must be reviewed by the

03:20PM   16   probation officer on at least an annual basis.

03:20PM   17        You must provide the probation officer access to any

03:20PM   18   requested financial information and authorize the release of

03:20PM   19   any financial information.  The probation office may share

03:20PM   20   financial information with the U.S. Attorney's office.

03:20PM   21        You must apply all monies received from income tax

03:20PM   22   refunds, lottery winnings, inheritance, judgments and any

03:20PM   23   anticipated or unexpected financial gains to the outstanding

03:20PM   24   court-ordered financial obligation, at the discretion and

03:20PM   25   direction of the Court.

| 03:20PM | 1 | You must not incur new credit charges, or open |
|---|---|---|
| 03:20PM | 2 | additional lines of credit, or apply for any loans without |
| 03:20PM | 3 | prior approval of probation.  You must not borrow money or take |
| 03:20PM | 4 | personal loans from any individual without prior approval of |
| 03:20PM | 5 | the probation officer. |
| 03:20PM | 6 | You must maintain a single personal bank account, |
| 03:20PM | 7 | separate and apart from your spouse, any family members or |
| 03:20PM | 8 | others, into which all income, financial proceeds, and gains |
| 03:20PM | 9 | must be deposited and from which all expenses must be paid. |
| 03:20PM | 10 | You must notify the probation officer of any |
| 03:21PM | 11 | contemplated employment and must obtain approval from the |
| 03:21PM | 12 | probation officer for all employment.  Unless you are |
| 03:21PM | 13 | self-employed, you may not be employed in any capacity wherein |
| 03:21PM | 14 | you have custody, control or management of your employees' |
| 03:21PM | 15 | funds. |
| 03:21PM | 16 | You must complete 12,800 hours of community service. |
| 03:21PM | 17 | The probation officer will supervise your completion of |
| 03:21PM | 18 | community service hours, including approving the community |
| 03:21PM | 19 | service site, the frequency of participation, etcetera.  You |
| 03:21PM | 20 | must provide written verification of completed hours to the |
| 03:21PM | 21 | probation officer. |
| 03:21PM | 22 | Finally, you must submit your person, property house, |
| 03:21PM | 23 | residence, vehicle, papers or office to a search conducted by a |
| 03:21PM | 24 | United States probation officer.  Failure to submit to a search |
| 03:21PM | 25 | may be grounds for revocation of release.  You must warn any |

| | | |
|---|---|---|
| 03:21PM | 1 | other occupants that the premises may be subject to searches |
| 03:21PM | 2 | pursuant to this condition.  The probation officer may conduct |
| 03:21PM | 3 | the search under this condition only when reasonable suspicion |
| 03:22PM | 4 | exists that you have violated a condition of supervision and |
| 03:22PM | 5 | that the areas to be searched contains evidence of this |
| 03:22PM | 6 | violation.  Any search must be conducted at a reasonable time |
| 03:22PM | 7 | and in a reasonable manner. |
| 03:22PM | 8 | Before I impose the sentence as stated, any legal |
| 03:22PM | 9 | objections from the government? |
| 03:22PM | 10 | MR. NOLAN:  Your Honor, I just wanted to ask the Court |
| 03:22PM | 11 | in 21-61 to incorporate the forfeiture orders at the PPP case |
| 03:22PM | 12 | at ECF numbers 116 and 123.  And then you've said you are going |
| 03:22PM | 13 | to give the defense some time I think in 23-3. |
| 03:22PM | 14 | THE COURT:  Yes.  And so in 21-61 that will be |
| 03:22PM | 15 | incorporated -- the order of forfeiture will be incorporated |
| 03:22PM | 16 | into the judgment.  We'll just have to wait for the amount. |
| 03:22PM | 17 | MR. NOLAN:  And no legal objections. |
| 03:22PM | 18 | THE COURT:  All right. |
| 03:22PM | 19 | Mr. Bakke. |
| 03:22PM | 20 | MR. BAKKE:  No legal objections, Your Honor. |
| 03:22PM | 21 | THE COURT:  Ms. Yamaga. |
| 03:22PM | 22 | MS. YAMAGA:  So I do -- I'm asking that the order of |
| 03:23PM | 23 | forfeiture in 23-03-LEK not be made final today.  It's not |
| 03:23PM | 24 | titled as a preliminary order of forfeiture, but I'm acting as |
| 03:23PM | 25 | if it is a preliminary, and I'm asking that it not be made |

| | | |
|---|---|---|
| 03:23PM | 1 | final so that I may make legal objections if needed. |
| 03:23PM | 2 | THE COURT:  Okay, very well.  So I'm going to give you |
| 03:23PM | 3 | a week. |
| 03:23PM | 4 | And what date would that be, Ms. Cortez? |
| 03:23PM | 5 | So if you could file any objections and then, Mr. |
| 03:23PM | 6 | Nolan, if you want to file a response, let me know. |
| 03:23PM | 7 | MR. NOLAN:  Okay, thank you. |
| 03:23PM | 8 | THE CLERK:  Your Honor, February 20th. |
| 03:23PM | 9 | THE COURT:  Any objection?  By February 20th, of |
| 03:23PM | 10 | course, meet and confer.  If you can work it out, that would be |
| 03:23PM | 11 | great. |
| 03:23PM | 12 | MS. YAMAGA:  Thank you. |
| 03:23PM | 13 | THE COURT:  And the import of the 12,800 community |
| 03:23PM | 14 | service hours, which is the most I've ever imposed, obviously |
| 03:23PM | 15 | is to reflect the harm to the community of $12,800,000. |
| 03:23PM | 16 | All right.  So I impose the sentence as stated.  I |
| 03:24PM | 17 | have considered the advisory guideline computations and the |
| 03:24PM | 18 | sentencing factors under 18 U.S.C., Section 3553(a).  As I |
| 03:24PM | 19 | explained more fully in my assessment of the specific |
| 03:24PM | 20 | aggravating and mitigating factors in your case, Mr. Kao, I |
| 03:24PM | 21 | have considered your history and characteristics as well as the |
| 03:24PM | 22 | serious harm to our community caused by your offenses. |
| 03:24PM | 23 | I have read the letters received on your behalf, I |
| 03:24PM | 24 | believe the sentence provides just punishment and, equally |
| 03:24PM | 25 | important, I hope it serves as an adequate deterrence to others |

| | | |
|---|---|---|
| 03:24PM | 1 | who may consider this type of fraud. |
| 03:24PM | 2 | I hope that this sentence will discourage others from |
| 03:24PM | 3 | heading down such a life-altering path.  I have considered the |
| 03:24PM | 4 | sentencing guidelines and the policy statements and the law. |
| 03:24PM | 5 | So I impose the sentence as stated. |
| 03:24PM | 6 | You do have the right to appeal your sentence and the |
| 03:25PM | 7 | manner in which it was determined.  But the deadline to file |
| 03:25PM | 8 | your notice of appeal is 14 days after your judgment is filed. |
| 03:25PM | 9 | If you file after those 14 days, you may be found to be too |
| 03:25PM | 10 | late and given up your right to appeal.  Do you understand |
| 03:25PM | 11 | this? |
| 03:25PM | 12 | THE DEFENDANT:  Yes, Your Honor. |
| 03:25PM | 13 | THE COURT:  All right.  So do you want me to make any |
| 03:25PM | 14 | recommendations to the Bureau of Prisons as to designation? |
| 03:25PM | 15 | MR. BAKKE:  Yes, Your Honor.  To Sheridan.  I think |
| 03:25PM | 16 | it's FCI Sheridan. |
| 03:25PM | 17 | THE COURT:  Okay, FCI Sheridan.  That's it?  There is |
| 03:25PM | 18 | no programming or anything.  He doesn't have a drug problem, |
| 03:25PM | 19 | he's already got a college degree. |
| 03:25PM | 20 | MR. BAKKE:  Well, Your Honor, he would like help with |
| 03:25PM | 21 | the RDAP program for the alcohol. |
| 03:25PM | 22 | THE COURT:  I can make a recommendation for the |
| 03:25PM | 23 | 500-hour residential drug treatment program. |
| 03:25PM | 24 | MR. BAKKE:  Yes, if you could. |
| 03:25PM | 25 | THE COURT:  Okay.  All right.  And so any objection to |

| | | |
|---|---|---|
| 03:25PM | 1 | self-surrender? |
| 03:25PM | 2 | MR. NOLAN:  No, Your Honor.  It was recommended by the |
| 03:25PM | 3 | probation office and the government will follow their |
| 03:25PM | 4 | recommendation. |
| 03:25PM | 5 | THE COURT:  All right, very good.  Let's have a date |
| 03:26PM | 6 | for the self-surrender. |
| 03:26PM | 7 | THE CLERK:  Yes, Your Honor.  Self-surrender to the |
| 03:26PM | 8 | facility will be March 25, 2025. |
| 03:26PM | 9 | THE COURT:  All right, March 25, 2025, Mr. Bakke and |
| 03:26PM | 10 | Ms. Yamaga. |
| 03:26PM | 11 | Mr. Kao, do you intend to pay for your own way and |
| 03:26PM | 12 | self-surrender, or do you want to turn yourself into the |
| 03:26PM | 13 | marshals here? |
| 03:26PM | 14 | MR. BAKKE:  I'll discuss with that with him because we |
| 03:26PM | 15 | still have that case in DC to deal with logistically. |
| 03:26PM | 16 | THE COURT:  I understand that, but he has to |
| 03:26PM | 17 | self-surrender on March 25th. |
| 03:26PM | 18 | MR. BAKKE:  Correct.  But I'm just saying between |
| 03:26PM | 19 | turning himself -- I'm sorry, did you say turn himself into |
| 03:26PM | 20 | FDC? |
| 03:26PM | 21 | THE COURT:  So Bureau of Prisons is going to designate |
| 03:26PM | 22 | him to the facility that he is going to be serving the time at. |
| 03:26PM | 23 | So he can either fly on his own expense or he can turn himself |
| 03:26PM | 24 | in to the marshals and be held here and then the marshals will |
| 03:26PM | 25 | transport him. |

| | | |
|---|---|---|
| 03:26PM | 1 | MR. BAKKE:  Right, I understand that.  Just so I |
| 03:27PM | 2 | understand -- yes, we want to self-surrender. |
| 03:27PM | 3 | THE COURT:  Right.  And so you are ordered to |
| 03:27PM | 4 | self-surrender by March 25, noon of the time zone in which the |
| 03:27PM | 5 | facility you've been designated to serve your term of |
| 03:27PM | 6 | incarceration.  If you fail to show up or you show up late, a |
| 03:27PM | 7 | bench warrant can issue for your arrest and that would not be a |
| 03:27PM | 8 | good thing. |
| 03:27PM | 9 | So you have the date, you can work with pretrial |
| 03:27PM | 10 | services on what you need to do in order to turn yourself in at |
| 03:27PM | 11 | the Bureau of Prisons facility. |
| 03:27PM | 12 | Anything else? |
| 03:27PM | 13 | MR. NOLAN:  No, Your Honor.  Thank you. |
| 03:27PM | 14 | THE COURT:  All right.  And then I guess I would want |
| 03:27PM | 15 | briefing or something from you on what we should do with |
| 03:27PM | 16 | Navatek's restitution request.  So I would suggest that you |
| 03:27PM | 17 | confer with counsel and maybe Navatek and then write me a |
| 03:27PM | 18 | letter with a CC to everybody, this is the discussion, this is |
| 03:27PM | 19 | what we believe we want from the Court. |
| 03:27PM | 20 | MR. NOLAN:  Could we have two weeks to do that? |
| 03:28PM | 21 | THE COURT:  Absolutely, yes.  I don't think there is |
| 03:28PM | 22 | any rush. |
| 03:28PM | 23 | MR. NOLAN:  Okay.  Thank you. |
| 03:28PM | 24 | THE COURT:  Two weeks would be. |
| 03:28PM | 25 | THE CLERK:  February 27, 2025. |

| | | |
|---|---|---|
| 03:28PM | 1 | THE COURT:  All right, February 27th, see if you could |
| 03:28PM | 2 | get me that. |
| 03:28PM | 3 | MR. NOLAN:  Thank you. |
| 03:28PM | 4 | THE COURT:  Very good.  Nothing further, Ms. Yamaga. |
| 03:28PM | 5 | MS. YAMAGA:  No, Your Honor.  Thank you. |
| 03:28PM | 6 | THE COURT:  Mr. Bakke. |
| 03:28PM | 7 | MR. BAKKE:  Nothing, Your Honor. |
| 03:28PM | 8 | THE COURT:  And, Ms. Nieling, anything else? |
| 03:28PM | 9 | MS. NIELING:  No, Your Honor. |
| 03:28PM | 10 | THE COURT:  All right.  So good luck to you, Mr. Kao. |
| 03:28PM | 11 | We stand in recess.  Thank you everyone. |
| 03:28PM | 12 | (Proceedings were concluded at 3:28 p.m.) |
| | 13 | |
| | 14 | |
| | 15 | |
| | 16 | |
| | 17 | |
| | 18 | |
| | 19 | |
| | 20 | |
| | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |

```
 1                COURT REPORTER'S CERTIFICATE

 2          I, Gloria T. Bediamol, Official Court Reporter, United

 3   States District Court, District of Hawaii, do hereby certify

 4   that pursuant to 28 U.S.C. §753 the foregoing is a complete,

 5   true, and correct transcript from the stenographically reported

 6   proceedings held in the above-entitled matter and that the

 7   transcript page format is in conformance with the regulations

 8   of the Judicial Conference of the United States.

 9

10          DATED at Honolulu, Hawaii, February 28, 2025.

11

12

13                              /s/ Gloria T. Bediamol

14                              GLORIA T. BEDIAMOL.

15                              RMR, CRR, FCR

16

17

18

19

20

21

22

23

24

25
```